A91A0206. LAWHORN v. THE STATE.
(408 SE2d 425)

ANDREWS, Judge.

Lawhorn, former chief deputy clerk of the Recorder's Court of Chatham County, appeals her conviction of two counts of theft by taking of funds in possession of that court.

Count 1 alleged that she had taken "funds belonging to Chatham County . . ., in the amount of $12,349, with the intention of depriving Chatham County of the funds, said acts being done . . . in breach of her duties, . . . in that Beverly Lawhorn did take cash collected for Chatham County by The Recorder's Court of Chatham County, con-

cealing said thefts of cash by drawing checks on an account denominated the Recorder's Court of Savannah and Chatham County Georgia Appearance Bond Account . . . and substituting the checks for cash. . . ." Count 1 then alleged 44 specific checks so used. Count 2 alleged theft of $18,169.50 by the same method of "funds belonging to The Mayor and Alderman of the City of Savannah." Fifty-one checks were alleged as used for this purpose.

Viewed in favor of the verdict, the evidence showed that defendant was the chief deputy clerk of the Recorder's Court, a constitutional court with jurisdiction over traffic and misdemeanor cases made within the city limits as well as the unincorporated areas of the county. The court also dealt with arraignments and preliminary hearings of felony cases. It handled cases made by both city and county law enforcement officers. Employees of the court were city employees, except the judges who were paid by the city and county.

When a person was arrested and posted a cash bond, a receipt was issued posting the bond. The cash and the court copy of that receipt were taken to the cashiers at the court. They entered the money into their computer system and at the end of the day gave their work sheets as well as a computer-generated summary of their transactions to Lawhorn, or, in her absence, the court administrator. The computer-generated report listed each case, including the number of the receipt issued for the transaction, whether the receipt represented check or cash, and totalled the amounts due to the city and the county from the day's receipts, as well as the amount of cash to be deposited to the cash bond appearance account. Lawhorn would then prepare a docket card for criminal cases, but not for traffic cases. She was to place on the docket card the receipt number, which she did in all cases except those where cash was taken. In addition, bond index cards were prepared from each bond receipt to use in tracking that money. At the end of each day, Lawhorn checked the cashiers' work and prepared the deposits.

The bond money was then deposited into the cash bond appearance account, which was maintained separately for this purpose. The amounts due the city and county as revenues were deposited to their respective accounts. When a defendant did not appear, did appear and was fined on misdemeanor and traffic cases, or was bound over on felony cases, the cash bond was forfeited to the city or county, credited toward the fine due the city or county, or the bond transferred to the state or superior court. For such purposes, a check would be written from the cash bond account, a receipt written, and that check included in the deposit. The number of that receipt would be written on the docket card or citation. Every payment, for whatever purpose, was to be receipted and the receipt number placed on the docket card. When a new court administrator arrived in 1985, Law-

horn explained to him that putting the check number on the card instead of the receipt number would not provide an audit trail. Cash appearance bond account check numbers instead of receipt numbers were found on all the cards contained in the indictment.

In 1988 the new administrator requested the city and county auditors to audit the court. A sample audit was done, revealing instances where no receipt was found for checks written on the cash appearance bond account. Upon retracing the defendant's name contained on the check notation line, with a "BF" or "F" notation, indicating bond forfeiture or fine, the auditors discovered that in these cases, the check written on the cash appearance bond account would have been substituted for a like amount of cash which was removed from that day's deposit. That defendant's record was never cleared in the court or posted into the cash management system.

While all cash appearance bond checks required two signatures, Lawhorn's was always one of them if she were present and only checks bearing her signature were connected with cases where no receipt was issued. She was the only one of those authorized to sign checks who was present on each occasion when a check was substituted for cash. During her interview with investigators, before the significance of the receipt number was known to them, Lawhorn told them she had placed the check numbers on the docket cards for audit purposes.

Lawhorn's personal bank account and that of her husband, a city policeman, were reviewed, revealing over $10,000 in cash deposits for 1988 and early 1989 when the thefts occurred. They also made over $2,000 in cash payments for their child's day care during this period. Lawhorn's and her husband's combined salaries were approximately $43,000 a year. Their average monthly indebtedness was over $3,000.

1. Lawhorn enumerates as error denial of her motion for directed verdict as to Count 1, because of a fatal variance between the allegata and probata with regard to the victim of the crime. That motion was premised on the argument that, since the Recorder's Court was a "creature of the city," and the employees paid by the city, the county really had not been the victim of any crime as was alleged by the indictment.

"Based on *DePalma v. State*, 225 Ga. 465, 469 (3) (169 SE2d 801) (1969), our courts have departed from an overly technical application of the fatal variance rule, focusing instead on materiality. ' "The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." ' [Cits.] . . . [I]t is the underlying reasons for the rule which must be served: 1) the allegations must definitely inform the accused as to the charges against him so as to enable him to present his defense [and] not to be taken by surprise, and 2) the

allegations must be adequate to protect the accused against another prosecution for the same offense." *Partridge v. State*, 187 Ga. App. 325, 327 (3) (370 SE2d 173) (1988).

Here, Count 1 alleged the taking of money "collected for Chatham County" by the court, in specific amounts and with specific dates and check numbers used to appropriate the funds. "Ownership of stolen property can be alleged in the person having actual lawful possession (OCGA § 16-1-3 (10); *Spurlin v. State*, 222 Ga. 179, 182 (149 SE2d 315)), even though only a bailee (*Hall v. State*, 132 Ga. App. 612 (208 SE2d 621))." *Whitley v. State*, 176 Ga. App. 364, 365 (1a) (336 SE2d 301) (1985) (physical precedent).

The evidence showed that the city and county, separate legal entities, each was due revenues from the Recorder's Court. Because cash representing amounts of these fines and forfeitures was removed from the deposits, and checks in these same amounts were substituted, the city and county were the ultimate losers of the monies from their respective cases.

There was no error in denying the directed verdict.

2. Secondly, Lawhorn enumerates error in the court's refusal to substitute an alternate juror after the failure of juror Johnson on voir dire to acknowledge his friendship with the district attorney as well as his role as co-campaign manager during his last election. The trial was conducted by an assistant district attorney and there is no indication the district attorney personally participated.

The objection at trial was not made until the second day of the trial, after the empaneling of the jury the prior day and presentation of part of the State's case.

The colloquy between defense counsel and juror Johnson during individual questioning of the jurors reveals, as later acknowledged by defense counsel, that he "didn't ask a question that would specifically put the requirement on . . . Johnson . . . to answer the question as to whether he was in fact acquainted with Mr. Lawton." Defendant nonetheless contended that it was a denial of federal and state constitutional due process to seat as a juror the former head of the district attorney's election campaign.

The juror was qualified after appropriately answering the questions set out in OCGA § 15-12-164. "In all criminal cases both the state and the defendant shall have the right to an individual examination of each juror . . . prior to interposing a challenge." OCGA § 15-12-133.

Here, the prosecutor, during his individual questioning of Johnson, asked if anyone on the panel knew "either of these attorneys," referring to the two defense counsel. Johnson responded that "I know [defense counsel Cox, who ran against the district attorney], attend church with him, and also from the last District Attorney's race, and I

also know [second defense counsel]. . . ."

Defense counsel did ask one juror whom he questioned before Johnson if she knew the district attorney. He did not ask Johnson. He did ask Johnson if, of any prior questions asked of previous jurors, there were any with which he "had any kind of problem with." While the answer given was inaudible there is no indication, as acknowledged by defense counsel, that Johnson in any way gave other than truthful answers to the questions asked.

"Where the defendant . . . has failed to challenge any individual juror for cause, he is not entitled to a new trial solely on the basis that one or more members of his jury may have been subject to disqualification. [Cits.]" *Newby v. State*, 161 Ga. App. 805, 810 (4) (288 SE2d 889) -(1982). See generally *Mitchell v. State*, 69 Ga. App. 771 (26 SE2d 663) (1943). Here, unlike *Henderson v. State*, 251 Ga. 398, 402 (2) (306 SE2d 645) (1983), relied upon by Lawhorn, there was no denial of the right to ask the question.

3. Lawhorn enumerates as error the court's refusal to grant her motion for mistrial because of the prosecutor's "comments" on her exercise of the right to remain silent and on pre-trial plea negotiations.

Lawhorn testified during her cross-examination, regarding her pre-indictment interviews by the State, as follows: " . . . was there one question I did not answer you asked me? I never took the Fifth Amendment, I never hid behind my attorney, I answered every single question you give [sic] me. Q. Did you not take the Fifth Amendment one time? A. No, sir, I did not take the Fifth Amendment on anything." She was then asked if, when questioned about anything improper about tickets, her attorney asked if she could have immunity.

At that point, counsel objected and a bench conference was held, relating to a prior in-camera hearing, not included in the record, which apparently related to non-charged events. The only reference to a mistrial was in that exchange when Lawhorn's counsel said "I'm going to have to bring this whole thing in or else I want a mistrial." At that point the court sustained Lawhorn's objection to the question asked and no further relief was requested.

Since the objection was sustained and the motion for mistrial was not renewed thereafter nor was any additional relief requested by Lawhorn, there is nothing presented for our review. *Smith v. State*, 196 Ga. App. 758 (2) (396 SE2d 809) (1990).

Lawhorn also objects for the first time on appeal to questions asked concerning the contents of her and her husband's bankruptcy petition. " ' "Enumerations of error which raise questions for the first time on appeal present nothing for decision. . . ." ' [Cit.]" *Cooper v. State*, 188 Ga. App. 297, 298 (3) (372 SE2d 679) (1988).

4. The fourth enumeration is that the court's allowance of the use

of voluminous records and summaries by the accountants involved in the investigation was an abuse of discretion in that the prejudicial and "burden shifting" results outweighed any probative value.

During the trial, Lawhorn specifically objected on this basis to State's Exhibits 67 and 68, which were handwritten summaries prepared during the investigation by four accountants, all of whom testified. The original checks and receipts referenced on these summaries were introduced into evidence if they were listed in the indictment. The other checks and receipts were available to the defendant and his expert accountant for review.

The court administrator testified at length concerning the record-keeping procedures of the recorder's court and gave testimony fulfilling the business records exception to the hearsay rule with regard to the records maintained by the court, including computer-generated records. OCGA § 24-3-14; *WGNX v. Gorham*, 185 Ga. App. 489, 490 (3) (364 SE2d 621) (1988). As for the summaries used, such summaries of voluminous business records are admissible as long as the original records are accessible to the court and the parties, as they were here. *Tyner v. Sheriff*, 164 Ga. App. 360 (2) (297 SE2d 114) (1982). This argument is without merit.

The objection that evidence, otherwise admissible, is "prejudicial" is too vague to present a question for determination. *Sultenfuss v. State*, 185 Ga. App. 47, 49 (4) (363 SE2d 337) (1987).

Introducing many pieces of evidence against a defendant during a criminal trial does not in any way "shift the burden" of the proof which remains "beyond a reasonable doubt." That was the burden placed upon and remaining upon the State until the jury reached its verdict.

Numerous other evidentiary objections are argued in the brief but were not made to the court below during the trial and present nothing for our review. Id.

5. Lawhorn's motion for new trial raised the general grounds, challenging the sufficiency of the evidence under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). *Towns v. State*, 185 Ga. App. 545 (365 SE2d 137) (1988). Here, Lawhorn argues that the circumstantial evidence did not exclude every other reasonable hypothesis save defendant's guilt, as required by OCGA § 24-4-6. Her theory of defense was that the cashiers were the ones responsible for the thefts. "The question of whether there was a reasonable hypothesis favorable to the accused is a question for the jury. [Cits.] ' "If a jury is authorized to find that the evidence, circumstantial though it may be, is sufficient to exclude every reasonable hypothesis save that of guilt, the verdict of the jury will not be disturbed by the appellate court unless the verdict is insupportable as a matter of law. (Cits.)" ' *Jones v. State*, [156 Ga. App. 823] at 824 [(275 SE2d 712) (1980)];

[cits.]." *White v. State*, 253 Ga. 106, 107 (1) (317 SE2d 196) (1984).

Viewing the evidence in favor of the verdict, it was sufficient.

6. Finally, Lawhorn enumerates the failure to give "defendant's requested special verdict form" which she argues resulted in denial of the right to have the jury determine "each sub-count and amount in controversy."

No special form was submitted to the court and the only record reference to this issue is defendant's oral request after the close of the evidence that the jury be required to report guilty or not guilty on each of the "95 counts" in the indictment. The argument was that, absent that, the court could not order restitution.

Pretermitting the validity of such a request in a criminal case, see OCGA §§ 9-11-49; 9-12-2 relating to civil cases, since no restitution was ordered of defendant and she was convicted of two counts instead of 95, there was no harm to her and no error as enumerated.

*Judgment affirmed. Sognier, C. J., and McMurray, P. J., concur.*

DECIDED JUNE 11, 1991 —
RECONSIDERATION DENIED JULY 15, 1991.

*William O. Cox*, for appellant.

*Spencer Lawton, Jr., District Attorney, David T. Lock, Assistant District Attorney*, for appellee.