A93A2470. CAIN v. THE STATE.
A93A2472. COCHRAN v. THE STATE.
(442 SE2d 279)

ANDREWS, Judge.

Cain and Cochran appeal the judgments entered on their convictions of armed robbery, aggravated assault, and possession of a firearm during commission of a felony. Cain also appeals his conviction of kidnapping. The appeals are considered together.

Viewed in favor of the verdict, the evidence was that co-defendant Thomas[1] and Cochran had been dismissed from the Candler Road Winn Dixie Store in the summer of 1991, before the arrival of Manager Smith. Smith was familiar with the two men, however, and had specifically told Cochran to stay away from the store. On Friday evening, August 16, Smith noticed Cochran and Thomas enter the store

---

[1] Although Thomas was not tried with these defendants, he was awaiting trial on the same indictment and testified for the State at this trial.

around 9:30 or 10:00 p.m. He mentioned this to bookkeeper Howard, who was in the office in front of the store getting ready to tally the day's proceeds. She noticed both men, whom she knew, enter the store followed by two other men whom she did not recognize. The four walked single file across the lobby and went through a register line instead of going around, as intended.

Smith went after Thomas and Cochran and found them off the sales floor area near the motor room and storage room. Cochran was standing beyond the rest room and said he was waiting on Thomas. Because he had a "funny feeling," Smith thoroughly checked the motor room, but found no one. Although Smith was unaware of it because of his recent transfer to this store, there was an area referred to as "the hole" located near the motor room. This area was used by supervisors to monitor the entire stock floor from a cut out above the meat department. It measured about two-and-one-half by four feet and could accommodate two people. After Thomas exited the rest room, Smith asked Thomas and Cochran to leave the store and Howard saw them both in the exit area. The store closed at 11:00 p.m. After all other employees had left the store and the doors had been locked, Howard counted all the cash register tills and balanced the receipts. Because there was a mistake with some checks, the final tally took longer than usual. Smith and Coffey, the assistant manager, regularly stayed with Howard until she was finished.

As she was completing her tally around 12:30 a.m. (now August 17), she, Smith, and Coffey heard someone running down the aisle and shouting. They saw two males, one taller than the other and wearing a red Winn Dixie meat cutter's apron over his clothes and a hat. He was brandishing a .45 automatic pistol. The shorter man had a hooded sweatshirt on. One of them was wearing a "Ninja" mask.

The two men were shouting obscenities and ordered all three employees to lie on the floor of the small office, which they did. Howard surreptitiously took off her wedding rings and slipped them under a cabinet because she and her husband had promised to be buried in them. The man with the .45 pistol continued to threaten the three while the other man rifled the safe, removing a minimum of $1,500. Both Smith and Coffey had the pistol pressed to their heads while lying on the floor, and, while it was pressed against Coffey's, the slide was operated and a bullet placed in the chamber. During the entire episode, both robbers kept saying "one of you white m—— f——— is going to die," and asking who wanted to go first.

After emptying the safe and pilfering the wallets of Smith and Coffey, the three employees were forced at gunpoint to crawl down an aisle of the store toward the back. One of the robbers demanded something to tie them with and Coffey directed him to the extension cords. The three employees were then hogtied. At this point, Howard

heard a comment about a "fine white a—," and one of the robbers demanded that she remove her slacks. She was fondled while other obscene comments were made until the other man said they did not have time "for this" and the two men left the store. The employees got loose and called police. All three employees were familiar with Thomas' and Cochran's voices and did not believe that they were the two robbers.

Detective Bumgardner received information from an unidentified informant which led him to Thomas on the evening of August 17. At that time, he and other officers went to Thomas' apartment in a complex located within walking distance of Winn Dixie. Before knocking on the door, Bumgardner heard whispering behind the door. Upon knocking, the door was opened by Thomas' wife, who was told the officers wanted to talk about her husband. She asked them into the apartment and told them her husband was at the mall and there was no one else in the apartment. The officers heard something hit the wall in a bedroom. Asked again if anyone else was in the apartment, she said Cochran was there. She consented to a search of the apartment and the officers found Cochran in the child's bedroom and Thomas in the closet in the master bedroom. Thomas gave a false name initially. When Thomas was removed from the closet, the officers recovered $201 in cash from underneath him, including a marked five from the Winn Dixie. Underneath the mattress they found another $311, which Thomas contended was rent money and not part of the robbery proceeds.

Prior to arresting Thomas and Cochran, Detective Bumgardner had interviewed co-defendant Cook.[2] Cook and Cochran gave statements to the detectives acknowledging that they and Thomas and Cain had discussed robbing the Winn Dixie for about three weeks beforehand. Cook and Cochran acknowledged participating in the robbery, but only as lookouts.

Thomas testified at trial and said that he, Cochran, Cook, and Cain went into the store together the evening of the robbery and he and Cochran were in the back area when found by Smith. While he did not see Cook and Cain enter the "hole," as they were leaving the store, Cochran told him they were "up in that store."

Thomas said he and Cochran were the lookouts and saw Cain and Cook exit the store and run into the woods where they were waiting. They counted the money in Thomas' apartment and it was more than $2,000. Thomas said he and Cochran each got $75 and that part of the money he was sitting on when caught was Cochran's.

---

[2] Although Cook was tried with Cochran and Cain and convicted of armed robbery, aggravated assault, and possession of a firearm during a felony, his appeal is not before us at this time.

Cain, who is 6' 5" tall, testified in his own behalf and said that, on the evening of August 16, Thomas came to his apartment, located in the same complex, about 10:00 p.m. and asked if Cain was ready to rob the Winn Dixie, which they, along with Cook and Thomas, had been discussing for some time. While walking through the apartments, Cain said they ran into Jones, a friend of his, and told Jones they were going to hit the Winn Dixie. Cain testified that, at that point, because Jones advised him not to do it, he withdrew from the plan. Instead of robbing the store, he and Jones visited two girls elsewhere. Jones and Freeman, one of the girls, testified as alibi witnesses.

## Case No. A93A2470

1. Cain's third enumeration is that the court erred in admitting proof of a similar incident.[3]

On August 12, 1991, the M & T Store, a convenience store, was robbed. The store is located in the same area as the Winn Dixie. According to Omeni, the clerk, around 5:30 p.m., two men walked into the store, one tall and bearing a gun. The shorter man stood by the door. The tall man pointed the gun at the clerk's face and said "M—— f——, open that G— d— register." Although the man had a "wave cap," a stocking-like cap, pulled over his face, he removed it when the two ran out into the parking lot, and the clerk saw his face. The clerk was shown two photo spreads and identified Cain as the tall man with the gun and Cook as the one who blocked the door.

This crime and a similar act introduced against Cochran were originally included in the indictment but were severed from the Winn Dixie case on motions by Cain and Cochran. After pretrial notice and hearing pursuant to USCR 31.3, the court concluded that the incidents could properly be introduced as "similar transactions." *Williams v. State*, 261 Ga. 640, 641 (2) (409 SE2d 649) (1991); see *Parks v. State*, 199 Ga. App. 736, 737 (1) (406 SE2d 229) (1991).

Cain did file a motion in limine relating to the like act, but it alleged only that the State was attempting to circumvent the trial court's severance of the counts of the indictment alleging these crimes and that introduction of it would be "prejudicial." This latter objection is too vague and general to present any question for determination by the trial court or this one. *Sultenfuss v. State*, 185 Ga. App. 47, 49 (4) (363 SE2d 337) (1987). As the court explained on the former issue, the severance was primarily granted to prevent unfairness to other co-defendants, who were not involved in these similar acts,

---

[3] While the enumeration contends error in the court's charge, this is not argued and is deemed abandoned. Rule 15 (c) (2).

and this would not impact the admissibility of the "similar transactions" evidence. During argument, Cain did raise the lack of similarity of the crimes under *Williams*, and we consider this.

Here, both the M & T and Winn Dixie robberies were committed by two males, one brandishing a pistol and using similar obscene language in his demands for money; both stores were located within a short distance of each other and close to the apartment complex where Cain and Cook resided; both were conducted without the use of any observed transportation, indicating the perpetrators arrived and left on foot. The evidence was properly admitted. *Hickey v. State*, 202 Ga. App. 636 (415 SE2d 60) (1992); *Parks*, supra; *Lord v. State*, 199 Ga. App. 814, 816 (1a) (406 SE2d 137) (1991).

2. Cain's first enumeration is that the court erred in not granting his motion for mistrial made during the opening statement by the prosecutor.

The prosecutor stated: "You will hear some evidence about an individual named Ezra or Ezria Williams. Often times in a criminal case when there are witnesses to an incident, they don't always stick around. Mr. Williams apparently gave a statement to the police about what he knew what had happened in this case. Our investigators have been trying to find him. Our last information that we have is he is somewhere in New Jersey. His parents here don't keep track of him. He went up to New York to visit his sister and his sister kicked him out. So please don't let that —" At this point, Cain moved for a mistrial contending that the prosecutor had alluded to an unavailable witness "that is unavailable that would have some great information for them," and left the jury with the impression that the man had run away because of these dangerous individuals and "would have really nailed them if he was here."

The court denied the mistrial, but did sustain the objection that this was improper argument and instruct the jury that what counsel said was not evidence and the only evidence would come from the stand. Further, with regard to the missing witness, the court instructed that "any inference that there might be something else there that is not legally admissible, you are to disregard entirely."

" 'The granting or refusing of a motion for mistrial is necessarily a matter largely within the discretion of the trial judge, and unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial, the exercise of the judge's discretion will not be interfered with. [Cits.]' *Stanley v. State*, 250 Ga. 3, 4 (2) (295 SE2d 315). The circumstances of [this] case . . . do not reveal an abuse of the trial court's discretion in denying defendant's motion for mistrial. Curative instructions were promptly given. . . ." *Powell v. State*, 201 Ga. App. 188, 189 (2) (410 SE2d 378) (1991). See *Russell v. State*, 184 Ga. App. 657, 658 (1) (362 SE2d 392) (1987).

3. The second enumeration contends the court erred by not granting a mistrial after a comment by the prosecutor improperly shifted the burden of proof.

During the direct examination of Detective Bumgardner regarding the search of Thomases' apartment, the prosecutor asked the detective about a conversation with Mrs. Thomas which took place out of the presence of any defendant. A hearsay objection was made by counsel for Cochran, to which the prosecutor responded that she thought the detective could go into the conversation "without it being hearsay." The court then inquired "How can they cross-examine Ms. Thomas?" The prosecutor, in the presence of the jury, responded, "They can call her to the witness stand. She is available as a witness in the case." The court replied that the defendants "are not required to do that," at which point Cain moved for a mistrial.

The court denied a mistrial but instructed the jury that the defense was "under no obligation to offer any evidence, it is not compelled, cannot be compelled to testify, that is something that is freely up to the individual, and [the prosecutor] knows perfectly well that there is no reason that the defendant [has] to offer any evidence. That was an improper statement . . . I . . . instruct you to disregard that. It is up to the defendant to decide any way however the defendant wants to handle its case."

No renewal of the motion for mistrial was made after the curative instructions were given and there was no error. *Mack v. State*, 208 Ga. App. 513, 514 (430 SE2d 862) (1993); *Lewallen v. State*, 208 Ga. App. 138, 139 (429 SE2d 684) (1993).

4. Cain also objects to the court's allowance into evidence of hearsay threats made to Omeni, the clerk in the M & T robbery. The record reflects that Omeni was extremely nervous during his testimony and indicated that he had reason to be afraid about coming to testify.

During a bench conference, Cain objected that the incident about to be described improperly placed his character in evidence. The State responded that the statement was not being introduced for its truth, only to prove it was said and to explain Omeni's conduct during the trial.

The court, relying on *Walker v. State*, 187 Ga. App. 631, 633 (371 SE2d 199) (1988), allowed Omeni to testify that he was afraid to come to court because a woman had called him on the phone and identified herself as "Tameka's mom" and said "You the one that got Jay in trouble." Cain's first name was Jermaine and he was known on the street as "Jay." Tameka was a relative of Cain. The court instructed the jury that the information was not introduced for its truth, merely to show it was said, and to explain Omeni's conduct.

There was no error. *Walker*, supra.

5. Cain's fifth enumeration is that the court erred in not directing a verdict of not guilty on the armed robbery counts because of fatal variance between the allegata and probata.

As to each of the three victims in the Winn Dixie, the indictment charged defendants "did take from the person and immediate presence of [each victim] . . . U. S. Currency the property of [each victim] and of the value of over $5.00 by the use of a handgun."

Cain contends that, because the money taken belonged to Winn Dixie, not to the individuals, and since an amount over $5 was not taken from any individual employee, there was a fatal variance.

"In an armed robbery case, the state must allege and prove that the defendant took property of a person or persons other than the accused. OCGA §§ 16-8-41 . . .; 16-1-3 . . .; *McKisic v. State*, 238 Ga. 644 (2) (234 SE2d 908) (1977). However, 'ownership of the property taken may be laid in the person having actual lawful possession of it, although he may be holding it merely as the agent of another, and it is not necessary to set forth in the indictment the fact that the person in whom the ownership is laid is holding it merely as agent of the real owner.' [Cits.]" *Wilson v. State*, 250 Ga. 630, 632 (1) (300 SE2d 640) (1983).

Even assuming a variance, it was not such a variance as to affect the substantial rights of the defendant. *DePalma v. State*, 225 Ga. 465, 469 (3) (169 SE2d 801) (1969); *Lawhorn v. State*, 200 Ga. App. 451, 453 (1) (408 SE2d 425) (1991).

6. Cain enumerates the court's denial of his motion to sever his trial from that of his co-defendants as error.

Cain raised at pretrial hearings the possibility of problems arising under *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968). The State agreed to redact from any co-defendants' statements references to Cain, and this was done.

Also, Thomas and Cook both testified and were subject to cross-examination.

Jointly indicted non-capital defendants " 'may be tried jointly or severally, in the discretion of the trial court. OCGA § 17-8-4. The burden is on the defendant requesting a severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process.' (Citations and punctuation omitted.) *Barnett v. State*, 204 Ga. App. 491, 495 (2) (b) (420 SE2d 43) (1992)." *Johnson v. State*, 208 Ga. App. 747, 749 (2) (431 SE2d 737) (1993). See *Bailey v. State*, 203 Ga. App. 133, 137 (3) (416 SE2d 151) (1992).

There was no error.

7. Cain's seventh enumeration is that the court erred in charging the jury on the aggravated assault, kidnapping, false imprisonment,

and possession of a firearm during a felony because these offenses merged with the armed robbery charges.

However, at the conclusion of the charge to the jury, the court specifically inquired if there were exceptions to the charge on behalf of Cain, and there were none. Therefore, there is a procedural default barring appellate review of the charge. *Birchfield v. State*, 205 Ga. App. 870, 871 (2) (424 SE2d 66) (1992).[4]

## Case No. A93A2472

8. Cochran's first and second enumerations address the sufficiency of the evidence by contending the court erred in denying his motion for directed verdict and new trial on the ground that Cochran's conviction was based on the uncorroborated testimony of co-defendant Thomas.

The test to be applied in determining both these procedural matters is that of *Jackson v. Virginia*, 443 U. S. 307, 310 (99 SC 2781, 61 LE2d 560) (1979). *Wilburn v. State*, 199 Ga. App. 667 (1) (405 SE2d 889) (1991); *Stinson v. State*, 185 Ga. App. 543, 554 (364 SE2d 910) (1988).

"In Georgia, a defendant may not be convicted on the uncorroborated testimony of an accomplice. OCGA § 24-4-8. . . . The corroboration must be independent of the accomplice's testimony and it must connect the defendant to the crime or lead to the inference that he is guilty. [Cit.] 'However, the corroborating evidence need not of itself be sufficient to warrant a conviction of the crime charged. (Cit.) Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. (Cit.)' *Reaves v. State*, 242 Ga. 542, 543 (250 SE2d 376) (1978)." *Castell v. State*, 250 Ga. 776, 780 (1) (c) (301 SE2d 234) (1983).

Here, Cochran was a former employee of Winn Dixie, having been let go. He was in the store on the evening of the robbery and admitted he was there with Thomas. Both men were off the sales floor in areas with which they were familiar by virtue of their past employment. Not only did Thomas implicate Cochran, but Cain and Cook also did. Cochran was found hiding from the police with Thomas and money from the robbery was found on the premises.

The testimony of one accomplice may be corroborated by the tes-

---

[4] We note that the court did merge for sentencing purposes Counts 2 and 3 into Count 1, armed robbery counts, which was appropriate. There was no merger, either as a matter of fact or law, of the remaining offenses against the employees. There was a sequential series of crimes committed against the same victims. *Bales v. State*, 200 Ga. App. 97, 98 (2) (406 SE2d 790) (1991).

timony of another accomplice. *Morris v. State*, 204 Ga. App. 437, 438 (2) (419 SE2d 733) (1992); *Brown v. State*, 188 Ga. App. 266 (372 SE2d 832) (1988). Whether there has been adequate corroboration of the testimony of an accomplice is for the jury's determination. *Day v. State*, 197 Ga. App. 875, 876 (399 SE2d 741) (1990). There was adequate corroboration here. *Martin v. State*, 209 Ga. App. 720, 722 (1) (434 SE2d 534) (1993).

A person acting as a lookout during the commission of a crime is a participant in that crime. *DeLoach v. State*, 142 Ga. App. 666 (1) (236 SE2d 904) (1977).

9. Cochran's third enumeration complains of the admission of a "similar act" against him.

On June 30, 1991, the Winn Dixie store on Winters Chapel Road was robbed. While the cashier was tallying the receipts late at night, a lone gunman in a baseball cap and tee shirt came up behind her. He was carrying a gun and informed her that if she did not help him, he was "going to blow your f—ing head off." She put the money in a mail bag and he started out the door. Although she electronically locked the exits before he got out, he shot the glass out and escaped. The cashier ran into the parking lot and saw the robber and a second individual running across the parking lot toward an apartment complex.

Shortly after the incident, the cashier helped police prepare a composite of the robber and later picked a photo of Cochran from an array as the robber. At trial, she initially misidentified Cook as the robber, but then identified Cochran.

Cochran objected to the evidence both on the misidentification and on the basis that this robbery was not similar to the charged robbery because, in the latter, Cochran did not enter the store.

First, the misidentification went to the credibility of the witness and the weight of the evidence, not its admissibility. *Bryant v. State*, 174 Ga. App. 468 (1) (330 SE2d 406) (1985).

Secondly, in determining whether a "like act" is admissible, similarity is not the only factor, nor is it necessarily the controlling factor. The ultimate issue in determining the admissibility of evidence of other crimes is not mere similarity but relevance to the issues of the case being tried. *Felker v. State*, 252 Ga. 351, 359 (1a) (314 SE2d 621) (1984); *Henderson v. State*, 182 Ga. App. 513, 516 (2) (356 SE2d 241) (1987), aff'd in part and rev'd in part on other grounds, 257 Ga. 618.

Here, in addition to the use of the gun and similar obscene language, the victim of this incident and the charged crime was Winn Dixie, from which Cochran had been fired and told not to come on the premises. The evidence was admissible. *Jackson v. State*, 205 Ga. App. 7, 9 (3) (421 SE2d 119) (1992).

10. Finally, Cochran complains of the denial of his motion for

mistrial.

While Thomas was being cross-examined by counsel for Cain, Thomas was asked if Smith had told him not to come back into the store and received a negative answer. The following cross-examination by Cain then occurred: "Q. Say anything to Mr. Cochran in your presence about not coming back into the store? A. I remember earlier he had told him that he couldn't come back to the store no more because they had caught him stealing an escrow out of there one time."

At this point, counsel for Cochran moved for a mistrial on the basis that the statement had placed Cochran's character in issue.

" 'What is forbidden is the *introduction by the state* in the first instance of evidence whose sole relevance to the crime charged is that it tends to show that the defendant has bad character.' (Emphasis supplied.) *Frazier v. State*, 257 Ga. 690, 698 (362 SE2d 351) (1987). Here the answer was the natural response to the question asked by [co-defendant's] attorney, and the state took no part in its introduction. Also, the trial judge gave the appropriate limiting instructions." *Johnson v. State*, 258 Ga. 506, 508 (3) (371 SE2d 396) (1988).

*Judgments affirmed in Case Nos. A93A2470 and A93A2472. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED MARCH 10, 1994 —
RECONSIDERATIONS DENIED MARCH 23, 1994 — 

*William M. Warner*, for Cain.
*J. Phillip Hancock*, for Cochran.
*J. Tom Morgan, District Attorney, Robert M. Coker, Fran W. Shoenthal, Assistant District Attorneys*, for appellee.