**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 19, 2015**

# In the Court of Appeals of Georgia

A15A1282. LYMAN et al. v. CELLCHEM INTERNATIONAL, LLC.

RAY, Judge.

In 2010, Cellchem International, LLC, sued husband-and-wife Dale and Helen Lyman, both of whom had worked for Cellchem in various capacities, and also sued Tritec International, Inc., and Shekoy Chemicals US, Inc. (collectively "Appellants") alleging, inter alia, claims for computer trespass and computer theft, breach of fiduciary duty, and tortious interference with business relations. In 2014, a jury awarded nearly $7.4 million to Cellchem, divided variously among the individual Appellants, which included punitive damages and attorney fees.

In the instant appeal, the Appellants argue that the trial court erred in: (1) denying their motion for a directed verdict and new trial on Cellchem's claim for

tortious interference with business relations; (2) denying Mr. Lyman and Shekoy's motion for a new trial on Cellchem's claims of computer theft and computer trespass; (3) denying Appellants' motion for a new trial on Cellchem's claim for punitive damages; (4) in admitting certain Cellchem exhibits into evidence; and (5) in precluding Appellants from using Cellchem's federal tax returns at trial. For the reasons that follow, we reverse as to the tortious interference claim; affirm as to the claims of computer theft and computer trespass; remand for a new trial as to punitive damages; reverse as to Exhibits 72 and 73 and affirm as to Exhibits 76 and 77; and reverse as to the issue of the federal tax returns.

In brief, this case turns on Cellchem's allegations that the Lymans and a Chinese company called Jiangsu Yoke Technology Company Limited (hereinafter "Yoke"), which is not a party to this litigation, worked in conjunction with other entities to create a competing business designed to destroy Cellchem.

Cellchem sells flame retardants for use in the rigid foam industry. One of those flame retardants is known as TCPP. Mr. Lyman sold TCPP on behalf of Cellchem from 2003 until December 2009. His relationship with Cellchem was not exclusive, as he also sold materials for another company.

About six months prior to Mr. Lyman's resignation from Cellchem, Shekoy Chemicals US, Inc. ("Shekoy") was incorporated in the State of Georgia. Yoke created Shekoy to sell TCPP in the United States. Like Cellchem, Shekoy also is in the flame retardant business. Shekoy began selling TCPP in the United States in January 2010.

Mr. Lyman was an officer of Shekoy from its incorporation in May 2009, during the same time period when he also worked as Cellchem's sales agent. He introduced Yoke to Cellchem, and Yoke became one of Cellchem's TCPP suppliers. However, on December 8, 2009, Shekoy, along with a company wholly-owned by Mr. Lyman called Tritec International, Inc. ("Tritec"), entered into a deal with Yoke to distribute TCPP in the United States. When Cellchem learned about the deal, it ended its business relationship with Yoke.

Helen Lyman was Cellchem's operations manager. She resigned from Cellchem in an e-mail dated November 28, 2009. Just prior to resigning, Mrs. Lyman ordered 33 isotanks of TCPP, totaling more than 1 million pounds of the product. One of the Cellchem owners had directed her to order nine of those isotanks. Mrs. Lyman testified that she informed Cellchem about the rest of the orders, but when presented with a spreadsheet of TCPP orders, she acknowledged that those orders were not on

3

it. Cellchem testified that it was unable to store and pay for the rest of the TCPP orders, which hampered its ability to place future orders.

After Mrs. Lyman resigned, Mr. Lyman returned her work laptop to Cellchem. Cellchem claimed that Mrs. Lyman's business e-mails, which it needed, had been deleted. Cellchem presented evidence that its confidential QuickBooks files had been copied using a thumbdrive and computers that the Lymans owned.

After a trial, a jury returned a nearly $7.4 million verdict against the Appellants, divided as follows: (1) $100,000 against Mr. Lyman, Mrs. Lyman, and Shekoy on the computer trespass claim; (2) $100,000 against Mr. Lyman, Mrs. Lyman, and Shekoy on the computer theft claim; (3) $900,000 against Mr. Lyman, Mrs. Lyman, and Tritec for breach of fiduciary duty; (4) $900,000 against all Appellants for tortious interference with business relations; (5) $298,433.73 in attorney fees against all Appellants; and (6) $5.1 million against all Appellants for punitive damages. Only this latter punitive damages award was specifically apportioned between the Appellants: 98 percent to Shekoy, 1 percent to Mr. Lyman, 0.5 percent to Mrs. Lyman, and 0.5 percent to Tritec.[1]

---

[1] The Lymans and Tritec do not appeal from the breach of fiduciary duty verdict; none of the Appellants has appealed the verdict on attorney fees.

1. The Appellants first argue that the trial court erred in denying their motions for a directed verdict and new trial on Cellchem's claim of tortious interference with business relations. We agree.

"In reviewing the denial of a motion for a directed verdict . . . or motion for new trial, this Court must affirm if there is any evidence to support the jury's verdict, and in making this determination, we must construe the evidence in the light most favorable to the prevailing party." (Citations and punctuation omitted.) *Ferman v. Bailey*, 292 Ga. App. 288, 290 (2) (664 SE2d 285) (2008). Any evidentiary ambiguity must be resolved in favor of the verdict. *Dossie v. Sherwood*, 308 Ga. App. 185, 186 (707 SE2d 131) (2011). Moreover, after a jury verdict is approved by the trial court, a judgment, supported by the evidence, will not be disturbed on appeal unless there is a material error of law. *Archer Motor Co., Inc. v. Intl. Business Investments, Inc.*, 193 Ga. App. 86, 88 (2) (386 SE2d 918) (1989).

> To prevail on a claim of tortious interference with business relations, a plaintiff must prove the following elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of a contractual obligation or caused a party or a third party to discontinue or fail to enter into an anticipated relationship with the plaintiff; and (4) the defendant's tortious conduct

proximately caused damage to the plaintiff. Additionally, to be liable for interference with contractual or business relations, one must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract. In other words, all parties to a comprehensive interwoven set of contracts are not liable for tortious interference with any of the contracts or business relationships.

(Footnotes omitted.) *Onbrand Media v. Codex Consulting, Inc.*, 301 Ga. App. 141, 150 (2) (f) (687 SE2d 168) (2009). A third party who would benefit from the business relationship, even if not an intended beneficiary, is not a stranger to that relationship. *Atlanta Market Ctr. Mgt. Co. v. McLane*, 269 Ga. 604, 609 (2) (503 SE2d 278) (1998).

In its complaint and amended complaint, Cellchem argued that Mr. Lyman, Mrs. Lyman, Tritec, and Shekoy "interfer[ed] with Cellchem's business relations with its suppliers, customers and prospective customers pursuant to OCGA § 51-12-30[.]" The Appellants contend that Cellchem failed to identify any business relationship with which they interfered and failed to show that they were strangers to the business relationships, as required to establish an actionable tortious interference claim.[2]

---

[2] Cellchem concedes at the outset that Mr. Lyman and Tritec are not strangers to its relationship with its customers. Cellchem also specifically disclaimed any contention that Shekoy tortiously interfered with its relationship with Yoke.

6

(a) *Mr. Lyman and Tritec's interference between Yoke (Shekoy's parent company) and Cellchem*. The Appellants argue that because Cellchem unilaterally ended its business relationship with Yoke, there is no evidence that Mr. Lyman and Tritec induced Yoke to discontinue its business relationship with Cellchem. Dennis Spicher, who is part of the joint venture that owns Cellchem, testified that Cellchem "cut . . . off" its business relationship with Yoke after the Lymans left Cellchem's employ. He testified that the Lymans "came to us after the fact and they said we would like to continue to do business with you[,]" but that the Lymans told him to "shut down all of your terminals and buy from us, and we'll ship the product directly to your customer." Given that Cellchem did not have contracts with its suppliers, i.e., Yoke, Cellchem was free to cut off the relationship, and it did. Even though the Lymans's behavior may have motivated Cellchem to end the relationship, the law requires proof that Mr. Lyman and Tritec "*induced* a *third party* or parties not to enter into or continue a business relationship with the plaintiff that thereby caused financial injury." (Citation omitted; emphasis supplied.) *Taylor v. Calvary Baptist Temple*, 279 Ga. App. 71, 72 (2) (630 SE2d 604) (2006). Given that Cellchem ended the relationship with Yoke, we cannot find any evidence that Yoke – the only "third

7

party" at issue in this claim – was induced to end a relationship that it did not, in fact, end.[3]

(b) *Mrs. Lyman's interference with Cellchem's customers and suppliers*: The Appellants contend, inter alia, that a tortious interference claim will not stand against Mrs. Lyman because she was not a stranger to the business relationships at issue. We agree.

Spicher, one of the joint venturers who owned Cellchem, testified that Mrs. Lyman came to work at Cellchem as operations manager. Her duties included independently placing product orders with suppliers that Cellchem was contractually obligated to pay for; having contact with and receiving orders from Cellchem customers who purchased TCPP from the company; and fulfilling those orders. Mrs. Lyman also testified that, "customers would call, I would get their orders . . . get them on a truck and get them to wherever the customer needed them." She also testified that she handled purchase orders for Cellchem. Further, testimony showed that Mrs.

---

[3] We recognize that Cellchem, of course, asserts no tortious interference claim against itself. See generally *H & R Block Eastern Enterprises, Inc. v. Morris*, 606 F.3d 1285, 1295 (III) (B) (3) (11th Cir. 2010) ("it is well-established under Georgia law [that] a party cannot tortiously interfere with its own business relationships"), citing *Taylor*, supra.

Lyman was paid by the joint venturers, and that Cellchem reimbursed them for her salary.

Mrs. Lyman's own testimony confirms that she had a direct relationship with Cellchem's customers and received benefit in the form of payment for her work. In *Tom's Amusement Co., Inc. v. Total Vending Svcs*., 243 Ga. App. 294, 294 (533 SE2d 413) (2000) (physical precedent only), a Tom's route manager secretly disclosed confidential information to a competitor and misrepresented the company's financial status such that a customer terminated its relationship with Tom's. This Court held that, "[r]egardless of whether an employee is acting as an agent of his employer when engaging in the interference, he is not a stranger to the business relationship between his employer and the customers he personally services and thus cannot be held liable under a claim of tortious interference." Id. at 296 (2) (a), citing *Parks v. Multimedia Technologies, Inc.*, 239 Ga. App. 282, 291-292 (3) (f) (520 SE2d 517) (1999). Because of the interwoven relationship between Mrs. Lyman's duties and Cellchem's customers and suppliers, *Atlanta Market Ctr. Mgt*., supra at 609-610 (2), there is no evidence to support the finding that Mrs. Lyman was a stranger in the business relationships alleged.

9

(c) *Shekoy's interference with the relationship between Cellchem and its customers*. Again, we begin by examining whether there is any evidence to support that Shekoy was a stranger to the relationship between Cellchem and its customers. Cellchem's appellate briefs present us with no argument on this point as it relates to Shekoy.[4]

As already established, Mr. Lyman is Shekoy's general manager and is not a stranger to the relationship between Cellchem, which also employed him, and Cellchem's customers. Yoke, the producer from which Cellchem bought TCPP during the time period relevant to this case, owns the company that owns Shekoy. Yoke obviously had a financial interest in Cellchem's customers buying the TCPP it sold to Cellchem, so Yoke cannot have been a stranger to the relationship between Cellchem and its customers. Further, Mr. Lyman executed an agreement between Shekoy, Yoke, and his own company, Tritec, to form a TCPP sales/distribution company in the United States, clearly establishing that Yoke and Shekoy had a mutual financial interest in TCPP sales. "Where a defendant has a financial interest in one of the parties to the contract or in the contract [or business relationship], the

___

[4] See *McDuffie v. Coweta County*, 299 Ga. App. 500, 505 (2) (682 SE2d 609) (2009).

10

defendant is not a stranger to the contract or business relationship even though it is not a signatory to the contract. (Citation omitted.) *Dalton Diversified, Inc. v. AmSouth Bank*, 270 Ga. App. 203, 209 (4) (a) (605 SE2d 892) (2004). The wrongful conduct in which Shekoy is alleged to have participated – such as using information belonging to Cellchem, as provided by Mr. Lyman, to lure Cellchem's customers, as discussed more fully in Division 2, infra – is directly related to the "interwoven contractual relationship" between Yoke (which is, ultimately, Shekoy's parent company) and Cellchem for TCPP purchase and sales. See *Perry Golf Course Dev., LLC v. Housing Auth. of the City of Atlanta*, 294 Ga. App. 387, 389-390 (3) (670 SE2d 171) (2008) (public housing authority was not a stranger to contractual relationship between members of an LLC formed to redevelop public housing). Accord *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting, Ltd. of Atlanta*, 205 Ga. App. 57, 60 (1) (421 SE2d 295) (1992) (purchaser of radio station was not a stranger to contract between radio station's sellers and seller's lenders).

Defined more specifically, the issue before us encompasses the question of whether Shekoy, as a subsidiary of parent-company Yoke (which, as noted above, is not a stranger to the relationship between Cellchem and Cellchem's customers), can itself be a stranger to the relationship between those entities. This Court in the past

11

contemplated that, under some circumstances, a parent corporation might be a stranger to its subsidiary's business relations such that a claim against the parent for tortious interference could lie. See *SunAmerica Fin., Inc. v. 206 Peachtree St., Inc.*, 202 Ga. App. 790, 797-798 (3) (b) (415 SE2d 677) (1992). However, since that time, our Supreme Court in *Atlanta Market Ctr.*, supra at 609-610 (2), specifically disapproved of *SunAmerica* on this point, finding that "*all part[ies]* to an interwoven contractual agreement [or business relationship] are not liable for tortious interference with *any of the contracts or business relationships.*" (Citation omitted; emphasis supplied.) Id. at 610 (2). Or, as stated plainly in *In re Hercules Automotive Products, Inc.*, 245 B. R. 903, 910 (I) (Bankr. M.D. Ga. 1999), "[i]t follows from the holding in *Atlanta Market Ctr.* that as a matter of law, a parent corporation cannot be a stranger to its subsidiaries' business or contractual relations, and that no claim can be sustained against a parent for tortious interference with such relations." Here, while Shekoy occupies the role of subsidiary and not parent, we are persuaded that the interwoven web of business arrangements likewise applies in this context and that Shekoy, as a subsidiary, cannot be a stranger to its parent Yoke's business relations, which included the relationship between Cellchem and its customers. Therefore, Shekoy, through its parent, had a business relationship with Cellchem and its

12

customers and is not a stranger to that relationship. *Perry v. Unum Life Inc. Co. of America*, 353 F.Supp.2d 1237, 1240-1241 (III) (B) (N.D. Ga. 2005) (recognizing the Georgia Supreme Court's endorsement, in *Atlanta Market Ctr.*, of a line of cases reducing the number of entities against which a claim of tortious interference with business relations may lie and, in that context, *In re Hercules* and its finding that *Atlanta Market Ctr.* found that a parent corporation cannot be a stranger to its subsidiaries' business or contractual relations.)

While it is clear that the Appellants were not blameless in their machinations involving Cellchem, as evidenced, inter alia, by the unappealed breach of fiduciary duty verdict, Cellchem has failed to point us to any evidence that supports all of the required elements of tortious interference, as required, and we must reverse as to all Appellants.

2. Appellants next argue that the trial court erred in denying their motion for new trial as to the verdicts finding computer theft (OCGA § 16-9-93 (a)) and

computer trespass (OCGA § 16-9-93 (b))[5] against Mr. Lyman and Shekoy.[6] We disagree.

Cellchem argued, inter alia, that Mr. Lyman deleted backup files and copied computer files, including a QuickBooks file containing confidential financial data from a laptop provided to Mrs. Lyman during her employment. At trial, James Persinger, a cybercrime computer forensic specialist and former police officer, testified as an expert witness that he examined four computers belonging, variously, to Mr. and Mrs. Lyman, as well as two thumb drives that Mr. Lyman produced for the litigation and that he owned. Persinger testified that his forensic examination of the computers showed that a different thumb drive, which the Lymans had failed to produce despite a court order,[7] had been inserted into one of the computers (identified as the Cellchem Sony) and Cellchem's Quickbooks files had been copied onto it. He determined the QuickBooks files had been accessed and backed up, among other

---

[5] OCGA § 16-9-93 (g) provides for civil relief in the form of damages for infringement of the statute.

[6] Mrs. Lyman does not appeal the jury's verdict against her on Cellchem's computer trespass and computer theft claims.

[7] This thumb drive was eventually found, and the trial court sanctioned the Lymans and Tritec for violating an order to produce the thumb drive.

14

things, on the Cellchem Sony on November 27, 2009, and that the Cellchem Sony was last used on November 28 and 29, 2009. Persinger also found that Mr. Lyman's thumb drives had been inserted into both the Cellchem Sony and another computer, called the Shekoy PC, on November 29, 2009, and that three computers, identified as the Shekoy PC; the Cellchem Sony, which Mrs. Lyman used for her work at Cellchem; and the Lyman Gateway "were all sharing the same thumb drive at the same time period" on the weekend of November 28 and 29, 2009, the same time that Mrs. Lyman resigned from Celltech. Persinger determined that Cellchem's Quickbooks file was also stored on the Lyman Gateway. Cellchem then presented evidence that Mr. Lyman, while working for Shekoy, used Cellchem's computer data that was stored on one of the thumb drives to create a PowerPoint for Yoke, which is Shekoy's parent company, about direct sales of TCPP. Mr. Lyman denied this.

Mr. Lyman alleges on appeal that "he was in Pennsylvania when the purported computer crimes took place[,]" but the record shows that although he testified that he was in Pennsylvania on November 27, 2009, he also stated that he returned to Georgia on November 28, and was there on November 29, 2009. On December 1, 2009, Mr. Lyman had a dinner meeting with a Shekoy representative and with representatives from another company. That other company is among the clients that

15

Cellchem's president testified he lost to Shekoy. On December 8, 2009, Mr. Lyman executed an agreement between Shekoy, Yoke, and his own company, Tritec, regarding the establishment of a TCPP sales/distribution business in the United States which Tritec would manage.

> OCGA § 16-9-93 (a) defines computer theft as occurring when a person
>
> uses a computer or computer network with knowledge that such use is without authority and with the intention of: (1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) Obtaining property by any deceitful means or artful practice; or (3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property[.]

OCGA § 16-9-93 (b) defines computer trespass as occurring when a person

> uses a computer or computer network with knowledge that such use is without authority and with the intention of: (1) Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network; (2) Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or (3) Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program[.]

In this context, under OCGA § 16-9-92 (16) (A) and (B), the term "[u]se" includes, but is not limited to, causing or attempting to cause a computer to perform computer operations, or interrupting the function of a computer or computer program or data. OCGA § 16-9-92 (18) defines "[w]ithout authority" to include "the use of a computer or computer network in a manner that exceeds any right or permission granted by the owner of the computer or computer network."

Although Mr. Lyman testified that he only used the Cellchem laptop for e-mail, the evidence from the computer expert, as outlined above, as to the insertion of thumb drives and copying/backup of QuickBooks files, while circumstantial, is more than enough to satisfy the required "any evidence" standard of review, *Ferman*, supra, and to affirm the verdict as to Mr. Lyman. Further, given the proximity of the file copying, Mr. Lyman's business trip with the Shekoy representative and subsequent agreement between them, we cannot say the trial court lacked any evidence to support the verdict against Shekoy. See *Clarence L. Martin, P. C. v. Chatham County Tax Commissioner*, 258 Ga. App. 349, 350 (574 SE2d 407) (2002) (a corporate entity has imputed knowledge of matters within the knowledge of its officer when that knowledge is within the scope of the officer's duties).

3. The Appellants next argue that the trial court erred in admitting over their objections certain financial spreadsheets that Cellchem tendered to prove its damages. These spreadsheets were marked as Exhibits 72, 73, 76, and 77.

We review for abuse of discretion a trial court's decision as to whether a proper foundation was laid for a document's admission as a business record. *Roberts v. Community & Southern Bank*, 331 Ga. App. 364, 369 (2) (771 SE2d 68) (2015).

At trial, Appellants objected to Exhibits 72 and 73, which are expense reports, as summaries prepared for trial rather than in the regular course of business. They objected to Exhibits 76 and 77, which are sales reports, as being summaries of underlying documents that never were made available to the court or Appellants. In both instances, Cellchem countered with testimony from Steven Gabelman, the vice-president of Cellchem, that the exhibits were business records, created at or near the time the events occurred with information from someone with personal knowledge and a business duty to report, and kept in the regular course and practice of Cellchem's business.

OCGA § 24-8-803 (6) (A)[8] provides in pertinent part that records of regularly conducted activity may be admissible as a hearsay exception:

> Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . , a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if (A) made at or near the time of the described acts, events, conditions, opinions, or diagnoses; (B) made by, or from information transmitted by, a person with personal knowledge and a business duty to report; (C) kept in the course of a regularly conducted business activity; and (D) it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness[.]

(a) *Exhibits 72 and 73*: However, Gabelman also testified that in order to show cost divisions between TCPP and other products, Exhibits 72 and 73 were specially prepared for trial. He testified that, "we had a special document made. We don't, in our regular business records, divide a lot of those costs. And we try to make it, not

---

[8] "Because OCGA § 24-8-803 mirrors Rule 803 of the Federal Rules of Evidence, we will look to case law from federal courts within the Eleventh Circuit for guidance in interpreting the statute." (Citation omitted.) *Ware v. Multibank 2009-1 RES-ADC Venture, LLC*, 327 Ga. App. 245, 249 (2), n. 11 (758 SE2d 145) (2014).

19

simpler, but more pertinent to the trial by pulling out the TCPP from the other things that we sell, and, therefore, trying to make it more user-friendly for the [c]ourt."

It is well-settled that documents prepared for litigation are not "compiled as a matter of regular practice" for purposes of OCGA § 24-8-803 (6). See *Noble v. Alabama*, 872 F.2d 361, 366 (III) (11th Cir. 1989). Accord *E. H. Crump Co. of Ga. v. Millar*, 200 Ga. App. 598, 601 (3) (409 SE2d 235) (1991) (applying Georgia's former Evidence Code). We are further persuaded by *Carrie Contractors, Inc. v. Blount Constr. Group of Blount, Inc.*, 968 F.Supp. 662, 666-667 (M.D. Ala. 1997), which found, in an almost identical scenario, that where an affidavit from the president of one of the companies involved in the litigation stated both that the records at issue were prepared in the ordinary course of business and that they were prepared to aid attempts to settle the lawsuit, the records were not admissible because they were "prepared largely for the purposes of litigation" rather than "in the normal course of business." (Citation omitted.) Id. at 667. Because these summaries were used to establish damages, which the jury awarded, we cannot say their admission was harmless error, and the Appellants are entitled to a new trial as to damages. See *Noble*, supra at 367 (III).

20

(b) *Exhibits 76 and 77.* As noted above, Appellants objected to the admission of the sales report exhibits, contending that they were summaries and that the source documents underlying them had not been made available for evaluation.

First, no evidence was presented that the underlying documents were so voluminous that summaries were required. See OCGA § 24-10-1006. Compare *Lawhorn v. State*, 200 Ga. App. 451, 456 (4) (408 SE2d 425) (1991). Second, there is no evidence as to whether the underlying documents ever were made available.[9] Finally, the exhibits list transactions dated between 2006 and 2013 and contain no date indicating when they were created. However, as Gabelman established a foundation to authenticate these exhibits as data compilations, including testifying, inter alia, that they were created in the ordinary course of business and near the time of the events depicted, and no contrary evidence was presented as to these specific exhibits, we cannot say that the trial court abused its discretion in admitting them. See generally *Roberts*, supra at 372 (2).

---

[9] Cellchem's argument that the exhibits were based on an underlying document, referred to as D-201 and to which Appellants may have had access, is unavailing, as D-201 apparently dealt with expense records rather than the sales data at issue in Exhibits 76 and 77. Further, D-201 does not alter our decision in Division 3 (a), as there was no indication that D-201 met admissibility standards. See *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (II) (A) (11th Cir. 2004) (while underlying records need not be introduced, they still must be shown to be admissible).

4. Appellants argue the trial court erred in denying their motion for new trial on the issue of punitive damages. We agree.

While the jury apportioned the $5.1 million in punitive damages among the Appellants (98 percent to Shekoy, 1 percent to Mr. Lyman, and .5 percent each to Mrs. Lyman and Tritec), the verdict form did not delineate to which claims the damages were assigned, or in what proportion. Given our decision reversing the trial court in Division 1, those claims cannot provide the basis for any punitive-damages award. See *Wolff v. Middlebrooks*, 256 Ga. App. 268, 271 (3) (568 SE2d 88) (2002) (finding that when appellate court cannot determine upon what basis the jury rendered its verdict on a general verdict form, it also cannot determine the underlying tort theory upon which the jury based its award for punitive damages, and because jury may have based its award on an underlying claim for which there could be no liability, there can likewise be no recovery for punitive damages). However, the breach of fiduciary duty verdict in Cellchem's favor, which was not appealed, may support an award of punitive damages. *Bunch v. Byington*, 292 Ga. App. 497, 504 (4) (664 SE2d 842) (2008). The findings of computer theft and computer trespass against Mr. Lyman and Shekoy, which we affirmed in Division 2, also may support a claim for punitive damages. See *Automated Drawing Systems, Inc. v. Integrated Network*

*Svcs., Inc.*, 214 Ga. App. 122, 123 (1) (447 SE2d 109) (1994) (in case involving misappropriation of software and withholding of royalties, damages in tort consistent with OCGA § 16-9-93 (g) and punitive damages under OCGA § 51-12-5.1 (b) were authorized).

"Unfortunately, the verdict form in this case merely states that punitive damages should be awarded to [Cellchem] . . . but does not allow us to determine the underlying theory upon which the jury based its award. Accordingly, the award for punitive damages must be reversed[.]" (Footnote omitted.) *Southland Propane, Inc. v. McWhorter*, 312 Ga. App. 812, 821 (4) (720 SE2d 270) (2011). We remand this case for a new trial on punitive damages.

5. Appellants also argue that the trial court erred in preventing them from obtaining Cellchem's federal tax returns. We agree.

The Appellants contended at trial that they requested the tax documents via a notice to produce and that Cellchem had not provided them. The trial court initially stated that the tax records were "relevant" and "should be produced." Later, however, Cellchem argued that the service date on the notice indicated that it was issued outside the discovery period, and Appellants countered that a notice to produce is "under the evidence subpoena code, not under the discovery statute." The trial court

23

then stated that it would "reverse" itself, even though it still found the tax records "relevant," because "it's too late to get them; discovery is over."

Pursuant to OCGA § 24-13-27, "a party may request the production of documents at trial by serving a notice to produce on an opposing party. Thus, the fact that the . . . discovery period had expired prior to [Appellants] serving [their] notice to produce is irrelevant." *Gaffron v. Metropolitan Atlanta Rapid Transit Auth.*, 229 Ga. App. 426, 432 (4) (494 SE2d 54) (1997)[10] (finding that the trial court erred in granting a motion to quash a notice to produce on the ground that discovery period had expired).[11] Finding error, we reverse.

*Judgment affirmed in part, reversed in part, and case remanded. Barnes, P. J., concurs, McMillian, J., concurs in judgment only as to Division 4 and concurs fully otherwise.*

---

[10] This case was decided under the former OCGA § 24-10-26, which is now cited as OCGA § 24-13-27.

[11] We are unpersuaded by Cellchem's argument that there is a question as to whether the notice actually was served. Cellchem's lawyer merely stated that he could not locate the notice on one day of the trial, however, on another day at trial, Cellchem's attorney called the court's attention to the "file stamp and *service date*" on the notice. (Emphasis supplied).

Decided November 19, 2015.

Tortious interference with business relations. Cobb Superior Court. Before Judge Howell, Senior Judge.

*Richard A. Gordon; Troutman Sanders, Stephen W. Riddell, Gary D. Knopf, Patrick J. Schwedler*, for appellants.

*Maner, Crumly & Chambliss, Jonathan D. Crumly, Sr., J. William Fawcett*, for appellee.