A06A1181, A06A1182. BLACK v. THE STATE (two cases).
(635 SE2d 568)

BLACKBURN, Presiding Judge.

Eddie Black, Jr., and his wife, Pamela Black, were convicted of possession of methamphetamine[1] following a bench trial. In separate appeals, they both contend that the trial court erred in denying their motions to suppress, arguing that their consent to the search of their home was tainted by their son's unlawful arrest. For the reasons set forth below, we reverse the trial court's judgment in both cases.

> On appeal from a motion to suppress, the evidence is viewed in a light most favorable to upholding the trial court's judgment. The credibility of witnesses and the weight accorded their testimony rest with the trier of fact. Thus, the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous.

(Punctuation and footnotes omitted.) *Sanders v. State.*[2] So viewed, the evidence shows that an agent with the Cherokee County Multi-Agency Narcotics Squad had the Blacks' residence under surveillance for suspected drug activity based on an anonymous tip and information from a confidential informant. After several hours, a truck with three males, including the Blacks' 24-year-old son Rodney, left the residence. The agent followed in his unmarked vehicle and requested assistance from nearby patrol cars. A few minutes later, the truck pulled into a gas station, and all three males exited. The agent followed, and shortly thereafter a couple of patrol cars also pulled into the station. Upon noticing the patrol cars, Rodney immediately walked away from the truck and quickly into the gas station's store. He remained inside the store for less than a minute, exited through the store's opposite entrance, and began walking quickly toward some nearby woods.

---

[1] OCGA § 16-13-30.
[2] *Sanders v. State,* 247 Ga. App. 170 (543 SE2d 452) (2000).

At that point, the agent requested that one of the uniformed officers attempt to question Rodney as to what he was doing. An officer attempted to do so but was ignored, and after several repeated attempts to ask him questions, Rodney became belligerent, told the officer that he had no right to speak to him, and acted as if he was about to flee. The officer then grabbed Rodney's arm, causing him to become even more belligerent, and resulting in his arrest for obstruction. He was searched incident to the arrest and found to be in possession of methamphetamine.

After he was arrested, Rodney was read *Miranda* warnings and agreed to speak with the officers. He stated that he had drug paraphernalia in his room back at home and agreed to accompany the agents and allow them to search his room. As the agents and Rodney were about to leave the gas station, Pamela Black arrived and attempted to speak with her son. The agents informed her that Rodney had consented to a search of his room and asked her if she would accompany them back to the residence, which she did. There, a search of Rodney's room produced more methamphetamine. The agents also asked Pamela if she would consent to a search of her and her husband's room; however, she replied that they would have to get her husband's consent and that he was not currently at home.

After a few minutes, Pamela's husband, Eddie Black, arrived back at the residence. The agents informed him of the situation and asked if he would consent to a search of his bedroom. Eddie agreed and signed a written waiver of his *Miranda* rights, as well as a written waiver of his constitutional right to a search warrant. Prior to unlocking his bedroom, Eddie asked the agents if he was going to be arrested. The agents responded that it depended on what the search uncovered but that they could make no promises. Subsequently, Eddie unlocked his bedroom, and as a result of the search, the agents found a small amount of methamphetamine for which Eddie was arrested. Immediately thereafter, Pamela was read her *Miranda* rights and asked to empty her pockets. She complied, but in doing so, attempted to toss away a small bag containing methamphetamine and thus was arrested.

Both Eddie and Pamela were indicted for possession of methamphetamine. Both also filed motions to suppress what they claimed to be unlawfully obtained evidence. After a hearing, the trial court denied the motions and later, following a bench trial, convicted both Eddie and Pamela of possession of methamphetamine. These appeals followed.

1. Eddie and Pamela Black, in their respective appeals (Case Nos. A06A1181 and A06A1182), contend that the trial court erred in denying their motions to suppress, arguing that Eddie's consent to the search of their bedroom was tainted by the unlawful arrest of

their son. Specifically, Eddie and Pamela contend that Eddie's consent to the search was the product of several illegalities, beginning with the unlawful detention of their son and culminating in the agents' unlawful entry into their home. We agree.

Addressing the threshold question of standing, we find that Eddie and Pamela have standing in this matter. A defendant has standing to suppress evidence obtained through an illegal search or seizure only when his or her own rights are violated, because these rights are personal and cannot be asserted vicariously. *Rakas v. Illinois*.[3] See also *Lewis v. State*.[4]

Here, Eddie and Pamela contend that the police illegally searched their bedroom based on an invalid consent obtained when the police were illegally in their home. Clearly, they have standing to assert those rights, which are based on their expectation of privacy protected by the Fourth Amendment. The fact that the illegality of the presence of the police in their home was based on the police's illegal arrest of their son does not diminish their privacy interests in the police's search of their bedroom and its contents. We therefore find that they have standing to challenge the manner in which that illegality occurred. See, e.g., *State v. Corley*.[5]

Turning to the primary issue of whether the search of the Blacks' bedroom was valid, we note that "[t]he Fourth Amendment to the U. S. Constitution generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." (Punctuation omitted.) *State v. Randolph*.[6] However, a warrantless entry into and search of a residence may be authorized by the voluntary consent of the individual whose property is searched or by the consent of a third party who possesses common authority over the premises to be searched. Id. In this matter, the State contends that the narcotics agents obtained valid consent to enter the Blacks' home from Eddie and Pamela's son, Rodney, subsequent to his arrest. Whether Rodney's consent was obtained validly, however, is contingent upon whether his initial detention and arrest were lawful. See *VonLinsowe v. State*.[7] Our inquiry thus must now focus on the circumstances surrounding Rodney's detention and arrest.

---

[3] *Rakas v. Illinois*, 439 U. S. 128, 133 (II) (A) (99 SC 421, 58 LE2d 387) (1978).

[4] *Lewis v. State*, 233 Ga. App. 560, 561-562 (2) (504 SE2d 732) (1998).

[5] *State v. Corley*, 201 Ga. App. 320, 323 (411 SE2d 324) (1991) (physical precedent only).

[6] *State v. Randolph*, 278 Ga. 614 (604 SE2d 835) (2004), aff'd, 547 U. S. 103 (126 SC 1515, 164 LE2d 208) (2006).

[7] *VonLinsowe v. State*, 213 Ga. App. 619, 622 (2) (445 SE2d 371) (1994).

According to *Terry v. Ohio*,[8] police-citizen encounters are generally categorized into three tiers: consensual encounters; brief investigatory stops, which require reasonable suspicion; and arrests that must be supported by probable cause. *State v. Harris*.[9] In a first-tier encounter,

> police officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. There is no threshold requirement and indeed the individual may refuse to answer or ignore the request and go on his way if he chooses, for this does not amount to any type of restraint and is not encompassed by the Fourth Amendment. . . . So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.

(Citations and punctuation omitted.) *Celestin v. State*.[10] During a second-tier encounter, the police officer

> conducts a brief investigative *Terry* stop of the citizen. In this level, a police officer, even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity. To stop a citizen, the officer must possess more than a subjective, unparticularized suspicion or hunch. The officer's action must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion, and the officer must have some basis from which the court can determine that the detention was neither arbitrary nor harassing.

*Harris*, supra, 261 Ga. App. at 121-122.

The State, citing the United States Supreme Court's *Illinois v. Wardlow*[11] decision, asserts that the officer gained a reasonable articulable suspicion justifying a *Terry* stop based upon the facts that Rodney left a residence under surveillance for alleged drug activity,

---

[8] *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968).

[9] *State v. Harris*, 261 Ga. App. 119, 121 (581 SE2d 736) (2003).

[10] *Celestin v. State*, 255 Ga. App. 792, 793-794 (1) (567 SE2d 82) (2002).

[11] *Illinois v. Wardlow*, 528 U. S. 119, 124 (120 SC 673, 145 LE2d 570) (2000).

swiftly walked away from the officer attempting to follow him, and insisted that the police had no right to question him. The State further argues that Rodney's resistance to this brief detention justified his arrest for obstruction and the subsequent search which uncovered methamphetamine. The State, however, misses the point. The encounter with Rodney was at all material points a first-tier encounter, and the police clearly indicated that by their actions. Thus, whether or not the circumstances would have justified a second-tier detention is irrelevant and misleading.

Here, the police did not activate their blue lights when they pulled into the gas station, did not tell Rodney to stop, nor take any action indicating that he was being detained. To the contrary, the police simply approached him behind the gas station and asked if they could "talk to him for a second," none of which indicated Rodney was not free to leave. Thus, Rodney was completely free to exercise his right to ignore the police and to leave. See *Celestin*, supra, 255 Ga. App. at 793-794 (1). "Indeed, a citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter." *Harris*, supra, 261 Ga. App. at 122. Even running from police during a first-tier encounter is wholly permissible. See *State v. Dukes*.[12] Accordingly, Rodney's exercise of his right to avoid the police gave the police no grounds to grab him nor to arrest him for obstruction of justice. See *Harris*, supra, 261 Ga. App. at 122; *Dukes*, supra, 279 Ga. App. at 251.

Because this was a first-tier encounter which Rodney had every right to avoid, the State's arguments that reasonable articulable suspicion existed are misplaced and incorrect. The circumstances here are conclusive of the fact that Rodney's encounter with the police was a first-tier encounter, and thus an encounter which would not authorize a search. Even if the police had activated their lights or otherwise informed Rodney, after they detained him, that they were going to conduct a search, the search would still have been illegal in that the police had no reasonable articulable suspicion to do so.

The facts in *Wardlow* which gave rise to the officers' reasonable articulable suspicion in that case were markedly different than those at issue here. In *Wardlow*, the defendant was seen loitering near a building in an area of Chicago known for heavy narcotics trafficking. Id. at 121. He was holding an opaque bag and, immediately upon noticing the approaching officers, took off in headlong flight away from them. Id. at 122. Unlike the defendant in *Wardlow*, Rodney was not loitering in an area known for heavy narcotics trafficking, was not

---

[12] *State v. Dukes*, 279 Ga. App. 247, 251 (630 SE2d 847) (2006).

holding a suspicious looking bag, and at no point attempted headlong flight from the officers. See id.

In addition, the facts of the cases cited by the dissent in support of its theory that a review of the totality of the circumstances allowed for the officers' reasonable articulable suspicion are also distinguishable. In *United States v. Arvizu*,[13] the Supreme Court found that a border patrol agent had reasonable articulable suspicion to stop a suspected drug smuggler based on the fact that the defendant's vehicle had set out from a known drug area, along a seldom-traveled route commonly used by smugglers to avoid a border checkpoint, during a time of day when most border patrol agents would be in the middle of a shift change, and driving in a vehicle not well-suited to the rough road conditions and which was commonly used to transport drugs. In addition to this objective information, the agent noticed that the driver became rigid and nervous upon seeing the agent, and failed to acknowledge the agent's presence, even in this remote area where the agent was driving the only other vehicle present. Id. at 277. The agent further noticed that although the driver appeared to have his family in the van with him, they were miles away from any known recreational areas, and the children's knees were clearly elevated, suggesting the existence of concealed cargo in the passenger compartment. Id.

In *Evans v. State*,[14] this Court found that the arresting trooper had a reasonable articulable suspicion warranting a stop of defendant's vehicle based upon the defendant's clear violation of the law in not wearing a seatbelt; the defendant's startled reaction when spotting the trooper; the defendant immediately taking evasive action by turning down a side street; and the defendant returning to the original street and original direction of travel once he believed the trooper was no longer following him. In *Fitz v. State*,[15] the totality of the circumstances which provided the officer with a reasonable articulable suspicion included the presence of the defendant's vehicle along the side of the road near a wooded area that backed up to a residential subdivision for at least an hour; the defendant darting out of the woods wearing gloves in the summer; and the defendant appearing nervous as he got into his vehicle and attempted to drive away from the officer. Finally, in *Howard v. State*,[16] we found that reasonable articulable suspicion existed justifying the officer's stopping of the defendant's vehicle based on the fact that while at a

---

[13] *United States v. Arvizu*, 534 U. S. 266, 277 (122 SC 744, 151 LE2d 740) (2002).

[14] *Evans v. State*, 262 Ga. App. 712, 716 (1) (b) (586 SE2d 400) (2003).

[15] *Fitz v. State*, 275 Ga. App. 817, 819 (1) (622 SE2d 46) (2005).

[16] *Howard v. State*, 265 Ga. App. 835, 837 (595 SE2d 660) (2004).

residence attempting to serve an arrest warrant, the officer noticed the defendant stop his vehicle in front of the residence and then drive away immediately upon seeing the officer. In addition, the defendant's vehicle was similar to the vehicle the subject of the warrant was thought to possibly be driving, and the residence was located on a sparsely populated dirt road not likely to be traveled by nonresidents. Id. Under such circumstances, it was reasonable for the officer to suspect that the defendant was the subject of the warrant attempting to elude arrest. Id.

In all of the above cases there existed suspicious facts other than flight. In contrast, here there was no testimony that Rodney was specifically suspected of criminal activity or that the officers even knew who he was when he left his home. Nor was there evidence that the vehicle in which he was riding committed a traffic violation or was traveling in an area known for drug crimes. Furthermore, no testimony indicated that Rodney appeared nervous after seeing the officers. In fact, the totality of the circumstances here consisted of Rodney leaving a house that was under surveillance and walking away from police officers. However, neither Rodney's presence in the house under surveillance nor his walking away from the officers could provide the officers with a reasonable articulable suspicion. In *State v. Mallard*,[17] we held that officers had no reasonable articulable suspicion to justify stopping a vehicle that had just left a residence upon which officers were preparing to execute a search warrant for marijuana. Here, no warrant had been issued and no search was imminent. In *Harris*, supra, 261 Ga. App. at 122, we found that officers had no reasonable articulable suspicion to detain a defendant based on nervousness and defendant's cohort exiting and then immediately returning to a motel room upon seeing police.

The mere fact that during this first-tier encounter Rodney sought to "be let alone" by avoiding contact with police when he went into the store and out its back door, by quickly walking away from the officer, and by refusing to answer questions, did not create an objective articulable suspicion. See *In re J. M.*[18] ("citizens have a fundamental constitutional right to 'be let alone,' provided they are not interfering with the rights of other individuals or of the public"). As previously stated, "a citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter." *Harris*, supra, 261 Ga. App. at 122. Such conduct may not provide the basis for elevating the encounter to a second-tier *Terry* stop. Id. The totality

---

[17] *State v. Mallard*, 246 Ga. App. 357, 357-358 (541 SE2d 46) (2000).
[18] *In re J. M.*, 276 Ga. 88, 88-89 (1) (575 SE2d 441) (2003).

of the circumstances of Rodney's detention, arrest, and subsequent search does not provide a basis to disregard constitutional protections.

Having determined that the detention, arrest, and search of Rodney were unlawful, we now focus on whether Rodney's consent to the search of his bedroom was valid. *Pledger v. State*[19] is particularly instructive on this issue. In *Pledger*, the police went to the defendant's home in order to investigate suspected drug activity but did not have a warrant. Id. at 795. When they arrived, the defendant was not home, but two young men who answered the door allowed the officers to enter. Id. at 795-796. The officers did not determine whether the young men lived at the defendant's house and did not ask their permission to search the residence, but instead waited for the defendant to return. Id. Based on the fact that the officers smelled marijuana, the officers also detained both men. Id. at 796. The defendant returned to find four officers in her home and her two friends detained. Id. The officers requested that she consent to a search of the home, which she did. Id. As a result, marijuana was found and the defendant was arrested. Id.

In reversing the trial court's denial of Pledger's motion to suppress, this Court noted that the State bears the burden of proving that both the search and seizure of evidence were lawful. *Pledger*, supra, 257 Ga. App. at 796. OCGA § 17-5-30 (b). "Fundamentally, there exists a justified expectation of privacy against unreasonable *intrusions* into the home." (Emphasis in original.) Id. at 797. In order to justify a warrantless search on the grounds of consent, the State must prove the consent was voluntary and that it was not the product of an illegality. See also *VonLinsowe*, supra, 213 Ga. App. at 622 (2). Relevant factors to be considered include the temporal proximity of the illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct. Id. In *Pledger*, we concluded that the two young men had no authority to allow the officers into defendant's home, and therefore the officers had entered the home illegally. Id. at 798. Because the defendant only consented to a search shortly after she was confronted at night, by four officers illegally in her home, we found that the consent was not valid. Id. at 800.

Similar to *Pledger*, a review of the factors present here indicates that Rodney's consent was the product of his illegal detention and was also not voluntary. Here, Rodney initially attempted to avoid an encounter with the officer, but (assuming such occurred) the officer sought to detain Rodney despite not having a reasonable articulable

---

[19] *Pledger v. State*, 257 Ga. App. 794 (572 SE2d 348) (2002).

suspicion of criminal activity. Such interaction cannot support an obstruction charge. See *Dukes*, supra, 279 Ga. App. at 251. In addition, Rodney's consent to the search of his bedroom occurred within only a few moments after being unlawfully detained. Such factors demonstrate that Rodney's consent was a direct product of his unlawful detention and therefore his consent was illegally obtained. See *Pledger*, supra, 257 Ga. App. at 800; *VonLinsowe*, supra, 213 Ga. App. at 622 (2). As a result, the agents who entered and searched Eddie and Pamela's home to search Rodney's bedroom did so without either a warrant or valid legal consent, and thus had no legal reason to be inside Eddie's home at the time he returned. See *Pledger*, supra, 257 Ga. App. at 798. In light of this unlawful entry, the only remaining issue is whether Eddie's consent to the search of his and Pamela's bedroom, like Rodney's consent to the search of his own bedroom and Pledger's consent to the search of her home, was also the product of these preceding illegalities. See id. at 800.

Here, Eddie came home after dark to find narcotics agents unlawfully inside his home conducting a search of his son's bedroom. His consent to the search of his own bedroom was obtained only a short time after being informed that methamphetamine had been found in his son's bedroom and that his son had implicated him as a drug user. The record reveals no intervening circumstances that would attenuate the causal chain, and it is clear that the purpose of the agents' conduct was to secure a search of the home. Consequently, Eddie's consent was not purged of the taint of the preceding illegalities. See *Pledger*, supra, 257 Ga. App. at 800.

For the same reasons, the subsequent search of Pamela's person also constituted "fruit of the poisonous tree," as the agents would have had no probable cause to arrest and search her had they not first illegally obtained Eddie's tainted consent to the search of their bedroom. See *Pledger*, supra, 257 Ga. App. at 800. Accordingly, the trial court erred in denying Eddie's and Pamela's motions to suppress.

2. In light of our ruling in Division 1, it is unnecessary to address the remaining enumerations of error in both appeals (Case Nos. A06A1181 and A06A1182).

*Judgments reversed. Ruffin, C. J., Smith, P. J., Phipps and Mikell, JJ., concur. Andrews, P. J., and Adams, J., dissent.*

ADAMS, Judge, dissenting.

I respectfully dissent because, considering the totality of the circumstances, the officers had reasonable articulable suspicion to make a *Terry*-type investigative stop of Rodney Black. Accordingly, the officers were properly in the Black home when Mr. and Mrs. Black consented to the search of their own room.

"[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." (Citations and punctuation omitted.) *United States v. Arvizu*, 534 U. S. 266, 273 (122 SC 744, 151 LE2d 740) (2002). And this court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (Citation omitted.) Id. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (Citations omitted.) Id. And the Supreme Court has instructed that we must not evaluate factors considered by the officers in isolation from each other because by doing so we would fail to take into account the "totality of the circumstances." Id. at 274.

Here, the factors known to the officers before they seized Rodney Black for investigative questioning included the following: (1) an anonymous informant and a confidential informant had indicated that the Black residence might conceal a methamphetamine lab; (2) three young men departed from that house; (3) in direct response to seeing marked police cars pull into the gas station, Rodney stopped what he was doing and entered the gas station, then in less than thirty seconds he exited the opposite side and began walking "very briskly" toward the wood line behind the store; (4) as an officer called to talk to Rodney, Rodney kept moving faster toward the wood line, in what the officer described as a "speedwalk."

It is true that the normal support required to establish indicia of reliability for the anonymous tip and the confidential informant were not presented. See *Alabama v. White*, 496 U. S. 325, 332 (110 SC 2412, 110 LE2d 301) (1990) (regarding relevance of anonymous tips when determining whether reasonable suspicion exists); *Illinois v. Gates*, 462 U. S. 213 (103 SC 2317, 76 LE2d 527) (1983) (regarding confidential informants). But the fact that the officers had some information that illegal drug activity was occurring in the house is still part of the totality of circumstances that the officers faced when they considered how to react to Rodney Black's actions at the gas station; as is the fact that the three men left from that same house. Cf. *Rolfe v. State*, 278 Ga. App. 605 (630 SE2d 438) (2006) (previous reports of thefts and break-ins in area where defendants were found after business hours were relevant to totality of circumstances).

As for Rodney's reaction at the gas station, the testimony is that he reacted to the presence of the marked police cars. Although his actions may not amount to "headlong flight," the Supreme Court has explained that "nervous, evasive behavior is *another* pertinent factor in determining reasonable suspicion." (Emphasis supplied.) *Illinois v. Wardlow*, 528 U. S. 119, 124 (120 SC 673, 145 LE2d 570) (2000). See,

e.g., *Evans v. State*, 262 Ga. App. 712, 716 (586 SE2d 400) (2003) (startled reaction when spotting police vehicle and immediate evasive action relevant). Here, Rodney reacted to the police cars by going quickly into the station and out the other side in a "speedwalk" toward a wood line behind the station, accelerating as another officer approached him.

An individual has a right to ignore the police and go about his business when an officer attempts to question him or her without reasonable suspicion or probable cause. *Florida v. Royer*, 460 U. S. 491, 497-498 (103 SC 1319, 75 LE2d 229) (1983). "But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Illinois v. Wardlow*, 528 U. S. at 125. "Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." Id. Here, rather than continuing to talk to his companions while they were pumping gas, Rodney Black quickly went into the station and out the back door toward some woods. It was reasonable to conclude that he was not just going about his business but that he was reacting evasively in response to seeing the police cars. "[T]he determination of reasonable suspicion must be based on common-sense judgments and inferences about human behavior." Id. Although Rodney's actions may have been consistent with innocent actions, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U. S. at 277.

The officer who witnessed the entire affair testified that based on his experience, he had articulable suspicion to stop Rodney for further investigation:

> Well, it's articulable suspicion to me. He's coming from a possible drug house. He sees a patrol vehicle. I know I saw him look at the patrol vehicle and then he immediately makes an evasive action to go into the store. And then I would say in seconds, he shoots out the other side of the door and starts walking to an unknown area where he's leaving all his friends on the other side or whoever they were.

The officer made exactly the sort of inference or deduction based on the factors presented to him that he is authorized to make under the law. See, e.g., *Fitz v. State*, 275 Ga. App. 817, 819 (622 SE2d 46) (2005) (reasonable for officer to infer that defendant was engaged in criminal activity when a truck was parked for an hour in an unusual location near residential subdivision and defendant darted out of

woods wearing gloves in summer, got in truck, and drove off); *Howard v. State*, 265 Ga. App. 835, 836 (595 SE2d 660) (2004) (reasonable for officer, during attempt to serve search warrant, to infer that man who drove up, saw officer, and drove away was the person to be arrested).

Finally, the determination of whether the officers' actions were lawful does not depend on whether they proceeded as if they were involved in a first-tier encounter; it depends on whether they had reasonable suspicion of criminal activity before they detained the suspect. Officers with reasonable suspicion of criminal activity are not required to turn on their blue lights or otherwise immediately announce that they have the authority to perform a second-tier investigatory stop. They may proceed as they see fit under the circumstances.

I would therefore conclude that the trial court correctly held that the officers were justified in stopping Rodney Black for questioning. Rodney's subsequent voluntary consent to search his room gave the officers legal authority to enter the Black home. Therefore, the officers were at a place they were authorized to be when Mr. and Mrs. Black consented to a search of their own room. Accordingly, I would affirm the decision of the trial court.

I am authorized to state that Presiding Judge Andrews joins in this dissent.

DECIDED AUGUST 10, 2006 — 

*Bray & Johnson, Jonathan A. Kesler, Richard A. Jones, Mathew A. Baker*, for appellants.

*Garry T. Moss, District Attorney, Scott T. Poole, Assistant District Attorney*, for appellee.