*District Attorney*, for appellee.

## A10A2277. JUPITER v. THE STATE.
### (707 SE2d 592)

DILLARD, Judge.

Geoffrey Mario Jupiter was tried by a jury and found guilty of armed robbery, aggravated assault, and possession of a weapon during the commission of a crime. He now appeals these convictions, contending that the trial court erred in denying his motions to suppress evidence and for a directed verdict and in overruling an objection to commentary made by the State during its closing argument. Finding no error, we affirm Jupiter's convictions.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict, and Jupiter no longer enjoys a presumption of innocence.[1] So viewed, the record shows that Jupiter and his two cohorts, Ricky Timmons, Jr. and Bridgette Marvette Hines,[2] started 2009 with no pretense of good intentions, deciding to rob a grocery store on New Year's Day. The evening began with Hines, Jupiter, and Hines's 12-year-old son picking up Timmons to go commit the robbery. Upon arriving at the prospective crime scene, Hines and her son briefly went inside the store but then returned to the car shortly thereafter. The party of four then drove to a darkened parking lot next door, where Hines instructed her son to remove the vehicle's tag. The group returned to the store but this time parked even farther away. Timmons and Jupiter—wearing dark clothes and masks—went inside the store, armed with guns.

Once they were inside, Jupiter and Timmons demanded money from the clerk, and Jupiter jumped over the counter to grab the money. With a few thousand dollars and some cigars in hand, the men then fled from the store and sped off with Hines behind the wheel. Two law enforcement officers observed the men running and the vehicle speeding from the lot, and they quickly followed the car onto a side road before initiating a stop. Timmons and Jupiter then ran from the car. And while Jupiter successfully escaped, Timmons did not. A jacket and black scarf were later recovered by the police from the direction in which Jupiter fled.

After apprehending Timmons, Hines, and Hines's son, the officers returned to the crime scene. In a suspicious twist of fate,

---

[1] *See, e.g.*, *English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010); *Lott v. State*, 303 Ga. App. 775, 775 (1) (694 SE2d 698) (2010).

[2] Timmons pleaded guilty to robbery and testified against Jupiter and Hines, who were tried jointly.

Jupiter's mother and two brothers arrived shortly thereafter. After a brief discussion with an officer, Jupiter's mother gave that officer permission to search her home, which was located less than a quarter-mile from where the officers had stopped the getaway vehicle. A search of the Jupiter home produced a black shirt and a dark pair of pants just inside the entrance of an exterior crawlspace. The clothes were damp, dirtied with fresh mud and leaves, and devoid of spider webs or anything else that would otherwise suggest that these articles of clothing had been under the house for more than a brief period of time.

1. Jupiter argues that the trial court erred in denying his motion to suppress the evidence obtained from the search of his mother's home. Specifically, he contends that (1) he had standing to challenge the consent given by his mother, (2) his mother's consent to the search was invalid because "there was no reasonable articulable suspicion of illegal activity at her home,"[3] and (3) the denial of this motion was harmful error because this was the only evidence that corroborated Timmons's testimony. We disagree.

When a defendant's own rights are violated, he unquestionably "has standing to suppress evidence obtained through an illegal search or seizure[.]"[4] And at a suppression hearing, the State has the burden of proving that the challenged evidence was obtained through a lawful search and seizure.[5] We review a trial court's ruling on a motion to suppress evidence using the "any evidence" standard, "which means that we sustain all of the trial court's findings of fact that are supported by any evidence."[6] Thus, "[w]e construe all evidence presented in favor of the trial court's findings and judgment,"[7] accepting the trial court's decision unless it is clearly erroneous.[8]

At the motion to suppress hearing, it was adduced that an officer

---

[3] While Jupiter claims that he "does not contest the validity of the stop of his mother at the [grocery store], but [instead] maintains that her purported consent to search her house . . . was not valid," he in fact *does* contest the validity of the stop by claiming that the encounter was non-consensual and lacked a "reasonable articulable suspicion of illegal activity," thus (in his view) rendering his mother's consent invalid.

[4] *Black v. State*, 281 Ga. App. 40, 42 (1) (635 SE2d 568) (2006); *see also Lewis v. State*, 233 Ga. App. 560, 561-62 (2) (504 SE2d 732) (1998) ("A defendant has standing to suppress evidence obtained through an illegal search or seizure only when his or her own rights are violated, because these rights are personal and cannot be asserted vicariously." (citation omitted)).

[5] *See, e.g., State v. Fisher*, 293 Ga. App. 228, 230 (666 SE2d 594) (2008); *Lucas v. State*, 284 Ga. App. 450, 451 (644 SE2d 302) (2007).

[6] *Fisher*, 293 Ga. App. at 228-29; *see also Fleming v. State*, 282 Ga. App. 373, 374 (638 SE2d 769) (2006).

[7] *Fisher*, 293 Ga. App. at 229 (citation and punctuation omitted); *see also Fleming*, 282 Ga. App. at 374.

[8] *Fleming*, 282 Ga. App. at 374; *see also Fisher*, 293 Ga. App. at 230.

questioned Jupiter's mother when, 30 to 45 minutes after the crime, she arrived at the grocery store and parked near where Hines's car had been located during the commission of the robbery. The officer pulled up behind the mother with his lights activated after noticing something that looked like a black cloth or mask beside the car and two African-American males getting into the vehicle.[9] Based upon information that the officer had obtained through the ongoing investigation, he suspected that Jupiter was the fleeing suspect; and he had also already learned of Jupiter's home address. Thus, when the officer discovered that the woman inside the suspiciously parked vehicle was Jupiter's mother (after requesting and viewing her identification), he naturally asked her to step out of the vehicle to question her about the events that had just transpired. Jupiter's mother informed the officer that she had not seen her son since earlier in the morning and that she was unaware of whether he was at her home. And while other officers had previously arrived at the mother's house (after Hines and Timmons informed them of its location), the officer questioning Jupiter's mother obtained her permission to actually search for Jupiter at her home.

Shortly thereafter, while securing the perimeter, officers spotted the recently discarded clothing in the home's open crawlspace; and the mother told the officers that there should not have been anything under her house. At the officer's request, the mother rode to her home in the back of his patrol car because he was concerned that she might call to tip off Jupiter about the impending search.[10] The officer testified, however, that if the mother had objected to or denied his request, he would have allowed her to follow him in her vehicle. The officer further testified that (1) none of the officers investigating the crime ever threatened Jupiter's mother in any way, (2) she willingly unlocked the house for the officers, and (3) Jupiter's mother never told any of the officers that she would prefer it if they obtained a search warrant.

Jupiter argued at the suppression hearing that his mother's consent was only gained after an illegal stop, but neither probable cause nor a search warrant is required to search property when voluntary consent is obtained from "the individual whose property is searched or . . . a third party who possesses common authority over the premises to be searched."[11] And here, we have no doubt that

---

[9] The officer also testified that, in his experience, sometimes suspects who flee will call a friend or family member to come pick them up, and law enforcement was at that point searching for an African-American male suspect.

[10] Jupiter's brothers followed behind in the family vehicle.

[11] *Black*, 281 Ga. App. at 42 (1); *see also Smith v. State*, 264 Ga. 87, 87 (1) (441 SE2d 241) (1994) ("A warrantless search of a residence may be authorized by the consent of any person

Jupiter's mother had common authority over the crawlspace where the evidence was obtained because "[t]here was no evidence that [Jupiter] paid rent to his mother for the exclusive use of the [crawlspace] or that he had exclusive domain over the [crawlspace]."[12] Nevertheless, while obtaining valid consent eliminates the need for probable cause or a search warrant, the State must still prove that the consent was freely and voluntarily given;[13] and voluntariness is generally a question of fact for the trial court.[14]

On appeal, Jupiter argues that the officer engaged in a second-tier encounter[15] with his mother that was not supported by a reasonable articulable suspicion of illegal activity; however, the State argues that the officer's actions amounted to a consensual first-tier encounter.[16] Thus, whether Jupiter's mother gave valid consent is contingent upon an analysis of the legality of her encounter with law enforcement.[17]

In contending that his mother was illegally detained, Jupiter maintains that there was no testimony that his mother's identification had been returned or that she was allowed to return to her

---

who possesses common authority over or other sufficient relationship to the premises to be searched.").

[12] *Smith*, 264 Ga. at 87 (2) (further holding that the mother's "joint access and unhindered control over the [crawlspace] authorized the trial court to conclude that she had common authority"); *see also Montgomery v. State*, 155 Ga. App. 423, 424 (1) (270 SE2d 825) (1980) (noting that the voluntary consent of the head of a household "to the search of premises owned or controlled by such head of the household is sufficient to authorize a search of the premises").

[13] *E.g., State v. Baker*, 261 Ga. App. 258, 259 (582 SE2d 133) (2003); *Hunter v. State*, 190 Ga. App. 52, 53 (1) (378 SE2d 338) (1989).

[14] *E.g., Baker*, 261 Ga. App. at 259; *Sledge v. State*, 239 Ga. App. 301, 303 (1) (a) (521 SE2d 212) (1999).

[15] Georgia "recognizes three tiers of police-citizen encounters: consensual encounters; brief investigatory stops that require reasonable suspicion; and arrests that require probable cause." *Fisher*, 293 Ga. App. at 230 (citation and punctuation omitted); *see also Lucas*, 284 Ga. App. at 452 ("There are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief stops or seizures that must be accompanied by a reasonable suspicion; and arrests, which can be supported only by probable cause." (citation and punctuation omitted)). In a second-tier encounter, even in the absence of probable cause, an officer "may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity." *Black*, 281 Ga. App. at 43 (1).

[16] In a first-tier encounter, an officer "may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officer[ ] [does] not detain the citizen or create the impression that the citizen may not leave[.]" *Lucas*, 284 Ga. App. at 452. To this end, "the officer must possess more than a subjective, unparticularized suspicion or hunch[,]" and the resulting action "must be justified by specific and articulable facts" that warrant the intrusion. *Black*, 281 Ga. App. at 43 (1).

[17] *See Walker v. State*, 299 Ga. App. 788, 791 (2) (683 SE2d 867) (2009) (holding consent to search invalid when it was the product of an illegal detention); *Black*, 281 Ga. App. at 42 (1) ("Whether [the] consent was obtained validly . . . is contingent upon whether [the] initial detention and arrest were lawful.").

vehicle.[18] However, we find this argument unavailing as there was also no testimony to suggest the mother did *not* have her license returned. Moreover, the officer did not command the mother to ride along in his car; he requested that she do so, and she willingly complied. Furthermore, there was no indication that the mother was threatened by police or otherwise pressured to consent to a search of her home. Finally, the reasons why the mother was approached, questioned, and thereafter asked for consent to search her home were all related to the search for Jupiter and the investigation of an armed robbery that had just taken place at the location of the stop not even an hour beforehand.[19] Thus, pretermitting whether the stop was a first- or second-tier encounter,[20] the trial court did not err in denying Jupiter's motion to suppress because either encounter would have been valid under the foregoing facts and circumstances.[21] The trial court found that the mother's consent was voluntary and that the officer's actions were reasonable due to (1) her arrival at the crime scene shortly after the commission of the robbery, (2) the black mask spotted near her vehicle, (3) the mother's familial relation to Jupiter, and (4) the fact that the more extensive search was only conducted *after* she gave the officers permission to do so. Accordingly, there is evidence to support the trial court's finding that, while the

[18] *See State v. Felton*, 297 Ga. App. 35, 37 (676 SE2d 434) (2009) (noting that the following factors have been given particular scrutiny in determining whether an encounter is consensual: "(a) whether the driver's documents have been returned . . . ; (b) whether the officer informed the driver that he was free to leave; and (c) whether the driver appreciated that the traffic stop had reached an endpoint").

[19] *Cf. Felton*, 297 Ga. App. at 37 (holding that consent was product of an illegal detention because the "consent was not within the scope of the original traffic stop," which had ended before consent was given).

[20] *See Robinson v. State*, 295 Ga. App. 136, 138 (2) (670 SE2d 837) (2008) (first-tier encounter elevated to second-tier when officers asked individual to step out of vehicle, conducted pat down, ran driver's license, and put in patrol car during commission of a search); *Postell v. State*, 279 Ga. App. 275, 276-77 (630 SE2d 867) (2006) (first-tier encounter with valid consent to search when no indication that officer "engaged his siren and emergency equipment, drew his firearm, . . . made any other show of force[,] . . . threatened, coerced, or physically restrained [individual] . . . during the officer's approach and ensuing conversation"); *O'Neal v. State*, 273 Ga. App. 688, 689 (616 SE2d 479) (2005) (second-tier encounter when police pulled up behind parked car with lights and siren engaged); *Baker*, 261 Ga. App. at 259 (encounter transformed into second-tier when officers began a pat down of individuals); *Davidson v. State*, 257 Ga. App. 260, 263 (1) (b) (570 SE2d 698) (2002) (first-tier encounter escalated to second-tier when officer removed keys from ignition and indicated that individual was not free to leave).

[21] *Compare Groves v. State*, 306 Ga. App. 779, 781-82 (703 SE2d 371) (2010) (holding that there were no specific and articulable facts supporting second-tier encounter because, without more, "mere presence in an empty truck plaza parking lot was not sufficient to warrant a traffic stop"); *Pritchard v. State*, 300 Ga. App. 14, 16 (684 SE2d 88) (2009) (noting that, without more, "an officer does not have reasonable, articulable suspicion to stop an individual who is driving near or parking near a location where crimes have been committed" (citations omitted)).

officer stopped and questioned the mother, his actions were perfectly reasonable given the totality of the circumstances, and there was nothing presented to rebut the evidence that the mother's consent to search was entirely voluntary.[22]

2. Jupiter next contends that the trial court should have granted a directed verdict because there was insufficient evidence to corroborate Timmons's testimony. Specifically, Jupiter argues that the clothing found at his mother's house did not independently connect him to the crime because witnesses could not identify the clothes discovered by the police as those worn by the perpetrator who fled. We disagree.

The trial court's denial of Jupiter's motion is considered by reviewing the evidence in the light most favorable to the jury's verdict to "determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[23] And while testimony by a single witness is generally sufficient to establish a fact, in felony cases "where the only witness is an accomplice, the testimony of a single witness is not sufficient[,]" and there must be corroborating circumstances.[24] The sufficiency of corroborating evidence, however, is for the jury to determine, and the evidence may be circumstantial in nature.[25] Nevertheless, when the identity and participation of a person are concerned, the corroborating evidence must be independent evidence that tends to connect the accused with the crime or leads to an inference of guilt.[26]

And while no witness could specifically identify the clothes that were recovered by the police as having been worn by the second robber, these articles of clothing matched descriptions given to the officer that both suspects wore dark attire with full sleeves. Additionally, Jupiter's mother's house was located only a quarter-mile

[22] See Pruitt v. State, 263 Ga. App. 814, 817 (1) (589 SE2d 591) (2003) ("Whether an incident qualifies as a first-tier encounter is a mixed question of fact and law, and we will sustain the trial court's findings ... if there is any evidence to support them." (citation omitted)); see also State v. Hopper, 293 Ga. App. 220, 222 (666 SE2d 735) (2008) (second-tier encounters are permissible when, in the totality of the circumstances, officers have "specific and articulable facts which, taken together with rational inferences from those facts, gave them a particularized and objective basis for suspecting ... criminal activity"); O'Neal, 273 Ga. App. at 691 ("In determining whether the officers had articulable suspicion to stop a citizen, we look to the totality of the circumstances." (citation omitted)).

[23] Bollinger v. State, 259 Ga. App. 102, 102 (1) (576 SE2d 80) (2003); see also White v. State, 250 Ga. App. 783, 783 (552 SE2d 927) (2001) (same).

[24] OCGA § 24-4-8.

[25] See, e.g., Myers v. State, 260 Ga. 412, 413 (3) (395 SE2d 811) (1990); Cox v. State, 243 Ga. App. 790, 791 (534 SE2d 464) (2000).

[26] See, e.g., In the Interest of P. A. W., 224 Ga. App. 329, 330 (1) (480 SE2d 347) (1997); Cain v. State, 212 Ga. App. 531, 538 (8) (442 SE2d 279) (1994); Adams v. State, 140 Ga. App. 621, 621 (231 SE2d 547) (1976).

from where officers stopped Hines's car, and the suspect who fled was seen running in that general direction, away from the store. Finally, the articles of clothing were discovered in a state suggesting that they had been recently worn and discarded in the exterior crawlspace of the home. We find that this evidence sufficiently corroborates Timmons's testimony that Jupiter participated in the robbery.[27]

3. Finally, Jupiter argues that the trial court erred in overruling an objection and failing to rebuke the State for making a pre-deliberation *Allen* charge argument to the jury during its closing statements. Jupiter, however, has waived this issue for appeal.

To begin with, there is no transcript of the closing arguments made by the parties. Instead, the transcript shows that after the trial court charged the jury, Hines's counsel made a note on the record of an objection that he made to the State's closing argument and its reference to another jury being impaneled if the current jury could not reach a decision. The court acknowledged that the statement had been made, that it was objected to by Hines's counsel, and that the court had overruled the objection during the State's closing.[28] But Jupiter's counsel did not join in this objection for the record, and there is no indication that he did so during closing argument either. Additionally, as the State notes in its responsive brief, there is nothing in the record suggesting that Jupiter and Hines agreed that their objections would be mutually applicable. Accordingly, Hines's objection did not preserve this issue for Jupiter,[29] and Jupiter has failed to show "a substantial error . . . which was harmful as a

---

[27] *See Cox*, 243 Ga. App. at 791 (finding, *inter alia*, footprints leading from crime scene to suspect's mother's apartment sufficient corroborating evidence); *see also Day v. State*, 197 Ga. App. 875, 876 (1) (399 SE2d 741) (1990) ("If the verdict is founded on slight evidence of corroboration connecting the defendant with the crime, it can not be said, as a matter of law, that the verdict is contrary to the evidence." (citation and punctuation omitted)).

[28] *See, e.g., Singleton v. State*, 231 Ga. App. 694, 694 (3) (500 SE2d 411) (1998) ("The trial court has broad discretion in controlling the argument of counsel and, unless it clearly appears that the court has abused this discretion and that such abuse has resulted in harm or prejudice to the opposing party, this Court will not undertake to control the exercise of such discretion.").

[29] *See, e.g., Lewis v. State*, 271 Ga. 500, 501 (2) (521 SE2d 193) (1999) ("[Appellant] did not join [co-defendant's] objections or make any arguments regarding the statement. Therefore, [appellant] cannot raise the issue for the first time on appeal."); *Maxwell v. State*, 267 Ga. App. 227, 231 (3) (599 SE2d 228) (2004) ("[I]t is well established that an issue raised by a co-defendant at trial does not preserve the issue for another co-defendant who does not join in the objection."); *see also Cox v. State*, 242 Ga. App. 334, 339 (11) (528 SE2d 871) (2000) ("[C]losing argument was not transcribed, and [appellant] did not supplement the record with a stipulation . . .; therefore, the enumeration dealing with improper closing argument . . . is deemed abandoned."); *Daker v. State*, 243 Ga. App. 848, 854 (18) (533 SE2d 393) (2000) ("[Appellant's] complaints concerning improper comments made by the prosecuting attorney during closing arguments have been waived by his failure to object at trial.").

matter of law."[30]

For all of the foregoing reasons, we affirm Jupiter's convictions. *Judgment affirmed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED MARCH 11, 2011.

*David J. Walker*, for appellant.
*Tracy Graham-Lawson, District Attorney, Billy J. Dixon, Assistant District Attorney*, for appellee.

---

[30] *Luker v. State*, 291 Ga. App. 434, 435 (2) (662 SE2d 240) (2008); *see also Medina v. State*, 234 Ga. App. 13, 15 (2) (505 SE2d 558) (1998) (same).