A11A2074. IN THE INTEREST OF J. B., a child.
(725 SE2d 810)

DILLARD, Judge.

Following a bench trial, a juvenile court found 16-year-old J. B. delinquent for committing the offenses of carrying a concealed weapon, possession of a handgun by a minor, and loitering. J. B. now appeals, arguing that the juvenile court erred in denying his motion to suppress unlawfully obtained evidence and in finding that the evidence was sufficient to prove beyond a reasonable doubt that he committed the offense of loitering. For the reasons set forth infra, we reverse the denial of J. B.'s motion to suppress and the adjudication of delinquency.

Viewed in the light most favorable to the juvenile court's findings and judgment,[1] the evidence shows that around 3:00 p.m. on February 22, 2011 (a day the local schools were on break), four officers in the Griffin Police Department's Crime Suppression Unit were on patrol in two separate squad cars when they observed several young males, including J. B., gathered in a vacant lot at the corner of Meriwether and Fifteenth Street. Because the officers were aware that illegal drug and street gang activities frequently occurred in the vacant lot itself and in the surrounding area, the officers decided as they drove by that they would investigate the young men if they were still gathered in the lot after the officers turned around. The officers in the first squad car then turned around, while the officers in the second car drove around the block and parked near to where a path leading to the back of the vacant lot exited onto an adjacent street that is routinely used by pedestrians walking to a nearby apartment complex.

---

[1] *In the Interest of R. F.*, 279 Ga. App. 708, 708 (632 SE2d 452) (2006).

As the officers in the first squad car returned to the front of the vacant lot, parked, and exited their vehicle, three of the young men, including J. B., began traipsing away via the path at the back of the lot. However, before they reached the street where the path exited, they encountered the two officers who had parked there. J. B. and the other two young men—who were a "good distance" behind him—stopped, and one of the officers asked J. B., who appeared to be sweating and out of breath as if he had been running, "what's your hurry?" And when J. B. failed to reply, the officer asked J. B. whether he was running away from the two other young men or from the officers in the lot. Again, J. B. did not reply, and the officer then directed J. B. to walk back down to the vacant lot "till we find out what's going on." The officers then ordered the other two young men to accompany them (along with J. B.) back to the vacant lot in order to determine what exactly was "going on." And while walking back to the lot, the officers observed the two young men who had been behind J. B. drop their black bandanas into some nearby bushes.

Once they had arrived back at the vacant lot, the officers asked the young men what they were doing, and one of the men responded that they were just "walking through." Unconvinced by this explanation and recognizing one of the young men as a gang member whom the officer had arrested on a weapons charge in the past, the officer began searching all of them. And while patting down J. B., the officer discovered a black bandana in J. B.'s front pocket similar to the bandanas dropped by the other two young men, indicating that J. B. was likewise affiliated with the same street gang. As the officer continued his pat-down, he noticed that J. B. was attempting to keep his knees and feet close together, so the officer ordered him to spread his feet apart. J. B. refused to comply, and when the officer reached near the waistband of J. B.'s pants, J. B. suddenly attempted to do the same. And as a result, the officer grabbed J. B.'s arms and handcuffed him. The officer then resumed his pat-down, at which point a small caliber handgun that had been concealed inside J. B.'s pant-leg fell to the ground.

A complaint and delinquency petition were filed in juvenile court, charging J. B. with carrying a concealed weapon,[2] possession of a handgun by a minor,[3] and loitering.[4] Shortly thereafter, J. B. filed a motion to suppress the handgun, arguing that it was discovered as a result of the police officers' unlawful detention and search.

On March 22, 2011, the juvenile court held a hearing on J. B.'s

---

[2] See OCGA § 16-11-126 (b).
[3] See OCGA § 16-11-132 (b).
[4] See OCGA § 16-11-36 (a).

motion to suppress, which it denied based upon the testimony of the two investigating officers. Immediately following that denial, the juvenile court conducted a bench trial, which concluded with the court finding that sufficient evidence supported the charges against J. B. Consequently, the court adjudicated him delinquent. This appeal follows.

1. J. B. contends that the juvenile court erred in denying his motion to suppress, arguing that the police officers had no reasonable articulable suspicion that he was engaging in criminal activity so as to justify detaining and searching him. We agree, and therefore, reverse the denial of J. B.'s motion.

At the outset, we note that "[o]n a motion to suppress, the burden of proving the search was lawful is on the [S]tate."[5] And in reviewing a trial court's decision on a motion to suppress, "we construe the evidence most favorably to uphold the findings and judgment, and the trial court's findings on disputed facts and credibility of the witnesses are adopted unless they are clearly erroneous."[6] Additionally, because the trial court is the trier of fact, "its findings are analogous to a jury verdict and will not be disturbed if any evidence supports them."[7] With these guiding principles in mind, we now turn to an analysis of J. B.'s argument that the officers' detention and search were unlawful.

Our analysis necessarily begins with the Fourth Amendment to the United States Constitution, which provides, inter alia, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[8] In construing this amendment, the Supreme Court of the United States has set forth—including most notably in *Terry v. Ohio*[9]—three tiers of police-citizen encounters: "(1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause."[10]

In a first-tier encounter, "police may approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity so long

---

[5] *Walker v. State*, 299 Ga. App. 788, 788 (683 SE2d 867) (2009).

[6] *Hammont v. State*, 309 Ga. App. 395, 396 (710 SE2d 598) (2011) (punctuation omitted).

[7] *Id.* (punctuation omitted).

[8] U. S. Const. amend. IV.

[9] 392 U. S. 1, 21 (III) (88 SC 1868, 20 LE2d 889) (1968).

[10] *Minor v. State*, 298 Ga. App. 391, 394 (1) (a) (680 SE2d 459) (2009) (punctuation omitted).

as the police do not detain the citizen or convey the message that the citizen may not leave."[11]

And here, the initial encounter between J. B. and the police officers occurred when J. B. was walking away from the vacant lot on the path leading to another street. At that point in time, the only objective observations the officers had made regarding J. B. was that he was a "good distance" ahead of the other two young men and appeared to be sweating and out of breath.[12] But instead of merely questioning J. B. regarding what he was doing, the officers who first encountered J. B. while waiting for him near the path's exit, stopped him and directed him to return to the vacant lot.

It is well settled that "a citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter[.]"[13] However, here, the officers waiting at the path's exit blocked J. B. and directed him to return to the vacant lot. And no reasonable person in J. B.'s position would have felt free to decline the officers' request or otherwise terminate the encounter.[14] Indeed, the investigating officer who ordered J. B. back to the vacant lot explicitly testified at the hearing that at the time he issued this directive J. B. was not free to leave. Thus, the officers' stop of J. B. "was a second-tier, investigative detention that required the [officers] to have a particularized and objective basis for suspecting that [J. B.] was or was about to be involved in criminal activity."[15]

Under *Terry*, a police officer, "even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity."[16] In doing so,

> [t]he officer's action must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion, and the officer must have some basis from which the court can determine that the detention was neither arbitrary nor harassing.[17]

---

[11] *Id.* (punctuation omitted).

[12] At the hearing, one of the officers testified that J. B. "was a good distance ahead of [the other] two subjects."

[13] *Thomas v. State*, 301 Ga. App. 198, 201 (1) (687 SE2d 203) (2009) (punctuation omitted).

[14] *See id.* at 201-02 (1) (holding that a second-tier detention occurred, as opposed to a first-tier encounter, when officer blocked defendant's path in parking lot, demanded that defendant submit to a pat-down, and testified that defendant was not free to leave encounter).

[15] *Id.* at 201 (1) (punctuation omitted).

[16] *Black v. State*, 281 Ga. App. 40, 43 (1) (635 SE2d 568) (2006) (punctuation omitted).

[17] *Id.* (punctuation omitted).

Furthermore, "[w]hile a mere hunch is not enough to render an investigative detention reasonable, law enforcement officers are permitted to draw upon their own experience and training in assessing the circumstances in which they find themselves[.]"[18] And thus when a court is considering the reasonableness of an investigative detention, it "properly defer[s] to reasonable inferences and deductions drawn by officers in light of their experience and training."[19]

In the case sub judice, the investigating officers testified during the motion-to-suppress hearing that their detention of J. B. and the other young men was based on the fact that the suspects were gathered in a vacant lot known for drug and gang-related activity and that three of them, including J. B., began walking away when officers approached them. Specifically, the officer that first made contact with J. B. did not observe him wearing a gang-related bandana and only testified that J. B. appeared to be out of breath, was sweating, and was a "good distance" ahead of the other two young men on the path when the officer stopped him. And although the officer testified that he observed the other two young men drop (presumably to conceal) their black bandanas,[20] it appears from the record that the officer only made this observation *after* he had already ordered all three to return to the vacant lot. But even if the officer's stopping of J. B. and observation of the other two men dropping their bandanas occurred simultaneously, by the officer's own admission these objective facts only led him to uncertainty as to whether J. B. was affiliated with the other two or was instead their potential victim.[21]

As we have previously held, "[m]ere presence in an area known to the police for [criminal] activity, without more, is insufficient to support a reasonable suspicion that one is engaged in or about to engage in criminal activity."[22] And here, the only other objective

---

[18] *Culpepper v. State*, 312 Ga. App. 115, 119 (717 SE2d 698) (2011).

[19] *Id.*

[20] At the hearing, both investigating officers testified that the black bandanas in question signified gang affiliation with the "Southside Boys."

[21] At the hearing, the officer testified that

[w]hen I pulled up, I asked [J. B.] – I got out of the car immediately, because he was like sweating, breathing hard. I said, are you running from the guys in the path or are you running from the two officers back there? He wouldn't say anything, he just looked at me. I said, let's walk back down here [toward the vacant lot] till we find out what's going on. He turned around and went down there . . . . We didn't know – as far as I knew, he may be a victim at this point, the other guys may have been trying to jump him and he was running from them. *I had no idea what was going on* . . . . (Emphasis supplied.)

[22] *Thomas*, 301 Ga. App. at 202 (1) (punctuation omitted); see *Walker*, 299 Ga. App. at 790-91 (1) (holding that defendant's apparent nervousness in the presence of a group of police

observation made about J. B. by the police was that he was walking away from the officers in the vacant lot and appeared to be sweating and out of breath as if he had been running when the other officers first made contact with him.[23] But walking away or even running from police officers, without more, does not justify a second-tier encounter.[24] Thus, J. B.'s presence in this area coupled with the fact that he walked away from the officers when they initially approached the lot and appeared sweaty and out of breath when the detaining officer stopped him does not amount to a reasonable articulable suspicion that J. B. was either committing, or was about to commit, a crime.[25]

Although only briefly mentioned by the testifying officers, the State, at least by implication, argues that the officers' second-tier stop was justified by a reasonable articulable suspicion that J. B. and the other young men who had gathered in the vacant lot were committing the offense of loitering. Again, we disagree.

Under OCGA § 16-11-36 (a), "[a] person commits the offense of loitering or prowling when he is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity."[26] In upholding the constitutionality of this statute in the face of a challenge that it was void for vagueness, our Supreme Court was persuaded by the reasoning of the Supreme Court of Florida when it denied a challenge to that state's nearly identical loitering statute by concluding that "the statute could be interpreted in a constitutional manner to proscribe only loitering or prowling which amounts to a threat to the safety of persons or property, conduct which persons of common intelligence may readily appreciate."[27] Specifically, "[a]s a threshold matter, the [statute] requires at least some manifestation of aberrant behavior and the circumstances must be such that this behavior

---

officers, even in a known drug area, does not provide a basis for a reasonable articulable suspicion).

[23] At the hearing, one of the investigating officers testified that J. B. was "fast pace walking," and that while it appeared J. B. had at one point been running, the officer conceded that he had "never seen him run."

[24] See Black, 281 Ga. App. at 44 (1) (holding that even running from police during a first-tier encounter is wholly permissible).

[25] See Brown v. State, 301 Ga. App. 82, 85 (686 SE2d 793) (2009) (holding that none of defendant's described activities, i.e., walking faster away from the police officer who knew him from a previous encounter, ignoring the police officer calling his name, or being present in an area known for its propensity for drugs and criminal activity, is a crime in and of itself, nor are they enough to make an objective determination that defendant was about to be engaged in criminal activity).

[26] See OCGA § 16-11-36 (a).

[27] Bell v. State, 252 Ga. 267, 270 (1) (313 SE2d 678) (1984).

warrants alarm for the safety of persons or property in the vicinity."[28] Our Supreme Court then concluded that while "perspectives may differ as to what conduct is 'usual' for law-abiding citizens, the statute narrows the construction of this phrase by making it clear the conduct must be that which would alarm a reasonable person that danger exists to person or property."[29]

And here, the officers testified that there would be no reason for anyone to be in the subject vacant lot at 3:00 p.m. "unless they were doing something illegal, something they're not supposed to be doing." But it is hardly naive (or unreasonable) to think that even in areas known for drug or gang-related activity, touch football, stickball games, or the like are played in vacant lots on days when children/teenagers are on break from school. Moreover, despite painting with such a broad brush, the testifying officers neglected to provide specific evidence that any of the young men in the lot that day when the police initially approached,[30] including J. B., exhibited any aberrant behavior that warranted an alarm for the safety of persons or property in the vicinity.[31] And while OCGA § 16-11-36 (b) provides in part that one of the circumstances which may be considered in determining whether such alarm is warranted is the fact that the person "takes flight" upon the appearance of police,[32] none of the officers specifically testified that they observed any of the young men start running when the officers approached. Thus, "[a]t best, [the officers' testimony] raised a subjective, unparticularized suspicion or hunch."[33] It did not constitute an objective basis for suspecting J. B. of loitering and thus did not justify a second-tier investigatory detention.[34] Accordingly, the trial court erred in denying J. B.'s motion to suppress evidence garnered from the stop.

2. J. B. also contends that the trial court erred in finding that the

---

[28] *Id.* (punctuation omitted).

[29] *Id.* at 271 (1).

[30] In this respect, it is important to note that there is nothing in the record indicating that at the time of the officer's second-tier encounter with J. B. that he was in any way affiliated with a gang.

[31] *Compare Evans v. State*, 216 Ga. App. 21, 23 (2) (453 SE2d 100) (1995) (holding that defendant's loitering, which entailed slowly circling a shopping center parking lot for 45 minutes in his car, pausing next to certain cars, and never parking to enter any stores, provided officers with articulable suspicion to justify a second-tier stop); *Hansen v. State*, 168 Ga. App. 304, 305-06 (1) (308 SE2d 643) (1983) (holding that defendant parking his car not in a parking space but near the exit of an apartment complex in which he did not reside and crouching down next to another car that he did not own constituted loitering and provided officers with articulable suspicion to justify a stop).

[32] *See* OCGA § 16-11-36 (b). We note that more than merely walking away, the word flight is defined as "the action of fleeing or *running away* from, or as from, danger, etc." The Compact Oxford English Dictionary 605 (2d ed. 1991) (emphasis supplied).

[33] *Thomas*, 301 Ga. App. at 202 (1) (punctuation omitted).

[34] *See id.*; *Walker*, 299 Ga. App. at 791 (1).

evidence was sufficient to prove beyond a reasonable doubt that he committed the offense of loitering. We agree.

When reviewing the sufficiency of the evidence supporting a juvenile court's adjudication, "we apply the same standard of review used in criminal cases."[35] Thus, "[w]e construe the evidence in favor of the court's adjudication and determine if a rational trier of fact could have found beyond a reasonable doubt that the juvenile committed the acts charged."[36]

And here, the juvenile court's finding that J. B. committed the offense of loitering was based on the same testimony provided by the investigating officers during the hearing on J. B.'s motion to suppress. In fact, the only additional evidence introduced was the testimony of a probation officer, who stated that J. B. had previously been subject to an abeyance order based on a curfew violation, and that of one of the police officers, who was recalled to describe the type of handgun J. B. had in his possession.

Given that we concluded in Division 1, supra, that the officers failed to provide evidence to support an articulable suspicion that J. B. was loitering, we similarly must conclude that the evidence was insufficient to support his adjudication of delinquency on that charge.

*Judgment reversed. Mikell, P. J., and Boggs, J., concur.*

DECIDED MARCH 9, 2012.

*Kimberly A. Gross*, for appellant.

*Scott L. Ballard, District Attorney, David J. Younker, Robert W. Smith, Jr., Assistant District Attorneys, Christy R. Jindra*, for appellee.

---

[35] *In the Interest of G. L. B.*, 301 Ga. App. 619, 620 (688 SE2d 400) (2009) (punctuation omitted).
[36] *Id.* (punctuation omitted).